Shirley Mello **RODRIQUEZ**, Plaintiff,

v.

Joseph **FURTADO**, et al., Defendants.

Civ. A. No. 87–1619–WF.

United States District Court,
D. Massachusetts.

Feb. 11, 1991.

Paul Patten, Somerset, Mass., for plaintiff.

Peter Knight, Morrison, Mahoney & Miller, Boston, Mass., Orlando deAbreu, Taunton, Mass., for defendants.

## ORDER

WOLF, District Judge.

### I. INTRODUCTION

This 42 U.S.C. § 1983 case arises out of a vaginal search of plaintiff Shirley Rodriquez on August 21, 1986. Defendants are Joseph Furtado, a detective in the Taunton Police Department who applied for and received a warrant for the body cavity search, David Westcoat, chief of the Taunton Police Department, the City of Taunton, Phillip Falkoff, M.D., who conducted the search, and Morton Hospital, Falkoff's employer. Plaintiff alleges that Furtado knew or should have known that his warrant affidavit did not establish probable cause and that the execution of the search by Furtado and Falkoff was clearly unreasonable and unconstitutional.

The Magistrate issued Reports and Recommendations on the motions for summary judgment of the police and medical defendants respectively, suggesting summary

judgment was appropriate for all defendants on grounds of qualified immunity and failure to state a claim. Plaintiff has objected to virtually all of the magistrate's findings and conclusions and the matter is now before this court to be considered *de novo*.

Although this court's reasoning differs in some respects from the Magistrate's, the court concludes that defendants are entitled to summary judgment on all of plaintiff's claims under federal law. In addition, plaintiff's pendent state claims must now be dismissed without prejudice to being pursued in the Courts of the Commonwealth of Massachusetts.

## II. RELEVANT FACTS

Except where otherwise noted, the following facts are not in dispute.

On August 20, 1986, defendant Joseph Furtado, at the time a 13–year veteran with the Taunton police force, applied for a warrant authorizing a vaginal body cavity search of plaintiff Shirley Mello Rodriquez. Furtado, a narcotics detective, was one of eight members of the Taunton Police Department who were permitted to seek drug search warrants without the approval of a supervising officer. Answers of the Defendant David Westcoat to the Plaintiff's First Set of Interrogatories at Nos. 6, 10 (# 25). This was the first time a Taunton police officer had applied for a warrant for a vaginal search. *Id.* at No. 18.

Furtado's three-page affidavit contained the following allegations:

—that the police department had received numerous calls through Crime Stoppers alleging that plaintiff and her husband were selling narcotics (dilaudids, cocaine, and heroin) out of their apartment, Affidavit in Support of Application for Search Warrant at ¶ 4 (Exhibit B to Amended Complaint (# 3));

—that Taunton police officers had periodically observed named "known drug users" entering plaintiff's apartment building and exiting a short time later, *Id.* at ¶¶ 4, 8;

—that on one occasion, Todd Guzman, a known drug user, was observed swallowing something when approached by police officers after exiting plaintiff's building, *Id.* at ¶ 4;

—that on one occasion, Paul Guzman, a known drug user, was observed making at least ten brief trips into plaintiff's apartment building in one evening, each time leaving a second individual waiting across the street in his automobile, *Id.*;

—that on one occasion, a Taunton police officer observed a fresh needle track on Paul Guzman's arm shortly after Guzman left plaintiff's apartment building, *Id.* at ¶ 5;

—that on one occasion, John Sekell, a known drug user, was arrested shortly after leaving plaintiff's building in possession of a glassine bag of marijuana, *Id.* at ¶ 8;

—that plaintiff was arrested on drug violations on March 1, 1977 and that plaintiff and her husband had been previously convicted for possession of narcotics, *Id.* at ¶¶ 9–11;

—that Taunton police officers had previously searched the residences of plaintiff and her husband on October 7, 1982, January 23, 1983, June 7, 1983, and June 14, 1986, seizing narcotics, drug paraphernalia and money on each occasion, *Id.* at ¶ 9;

—that plaintiff and her husband had been indicted on June 19, 1986 following the June 14, 1986 search and were awaiting trial, *Id.* at ¶ 10;

—that on June 17, 1986, affiant received a phone call from an unknown person stating that the police had not done well in the June 14, 1986 raid, that they had missed discovering Raul Rodriguez's "works" (needles and syringes) which were kept in the hallway near a window, and that plaintiff had dilaudids hidden in her vagina, *Id.* at ¶ 6;

—that following the June 14, 1986 raid, affiant contacted one of three confidential informants (the "CI") who had provided information leading to the search and that the CI stated that plaintiff and her husband were still dealing drugs, that they now required purchasers to take the drugs in their apartment and that plaintiff was

hiding narcotics in her vagina, *Id.* at ¶¶ 7, 14;

—that on August 20, 1986, the CI contacted affiant and stated that he had just left plaintiff's apartment, that plaintiff's husband had just come in with a large amount of "Black Flag" (heroin) which was being kept under the kitchen sink, that there might also be cocaine in the apartment, and that there was a strong possibility that plaintiff was holding some heroin in a rubber in her vagina, *Id.* at ¶ 12;

—that the CI also stated on August 20, 1986 that he believed plaintiff was hiding narcotics in her vagina because on one occasion, plaintiff had gone into the bathroom and returned with narcotics after the CI had paid for some drugs, because he had heard unidentified others talking about this practice of plaintiff, and because, Paul Guzman, who was "real close" to plaintiff, had told the CI that "she was holding the stuff up her" while pointing to the groin area, *Id.*

Plaintiff has generally denied all of the accusations contained in Furtado's affidavit and specifically denied that she was under indictment and awaiting trial on charges arising out of the June 14, 1983 search of her apartment. Plaintiff's Affidavit in Opposition to Defendants' Motion for Summary Judgment at 4–5 (# 26). However, her complaint did not allege that the affidavit contained false statements, but only that it was insufficient on its face to justify issuance of a warrant.

On August 20, 1986, an assistant clerk of the Taunton District Court issued warrants authorizing a search of plaintiff's apartment and a body cavity (vagina) search of plaintiff for heroin or other controlled substances, to be conducted by a licensed physician at Morton Hospital. Search Warrant (Exhibit A to Amended Complaint). The parties disagree substantially on the character of the ensuing events.

Furtado avers that the search warrants for plaintiff's apartment and body cavity were issued at 1:05 a.m. on August 21, 1986. Affidavit of Joseph Furtado at ¶ 9 (# 20). At 1:30 a.m., Furtado and several other officers, including Jane McManus, arrived at plaintiff's apartment. *Id.* at ¶ 10. Furtado knocked on the door and was told by plaintiff's daughter that Raul was in bed and that he should go away. Furtado knocked again and announced that he was a police officer. The daughter yelled "It's the cops" at least three times and Furtado announced his presence at least two more times. The officers then forced the door open. *Id.*

Furtado showed plaintiff the warrants and kept plaintiff and her family in the living room while a canine unit searched the apartment. According to Furtado, the dog did not sniff the individuals and did detect traces of narcotics in the bedroom. *Id.* Furtado and another officer then searched the bedroom and found a block of black material which looked like black heroin. The officers also allegedly found packaging material, handcuffs and tools, a bottle of powder used for cutting cocaine, and, in a light fixture in the hall, a needle and syringe. *Id.*

Furtado then allegedly informed plaintiff of the body cavity warrant. She responded by laughing and asking Furtado if he was going to execute the search himself. *Id.* at ¶ 11. Furtado told plaintiff the search would be executed by a doctor at Morton Hospital. He offered to let her go into the bathroom with Officer McManus and voluntarily remove anything hidden in her vagina, but plaintiff refused. *Id.* Furtado sent plaintiff to the hospital with McManus and continued searching her apartment until approximately 2:30 a.m. *Id.*

Rodriquez, to the contrary, stated that the police knocked and then immediately broke down the door when her daughter asked who was there. Pl. Aff. at 1. Before plaintiff could get out of bed, Furtado rushed in with a "look upon his face ... gleeful and lustful to the point of near irrationality." *Id.* He allegedly shoved the body cavity warrant in her face and told her she was going to Morton Hospital. *Id.* He demanded that she reach into her vagina and remove the "stuff," but she refused to do so. *Id.* at 2.

Furtado then herded plaintiff and her family into the living room for the duration

of the two hour search. Each occupant was sniffed by the dog. *Id.* Neither the search nor the dog allegedly turned up any contraband. *Id.* at 2, 4–5.

After the search was over, plaintiff's family members were moved into another room. Furtado informed plaintiff that she was not under arrest, but that she was going to be taken to the hospital. When she asked why, Furtado allegedly responded, "in a childishly playful voice, 'Because I've got this little piece of paper, Shirley.'" *Id.*

Officer McManus, who had not accompanied Furtado and the other officers, according to plaintiff, then arrived at the apartment. *Id.* at 2–3. She took plaintiff to the hospital, expressing her shock and disgust at the proceedings and apologizing to plaintiff for her role in it. *Id.* at 3.

The parties' stories are equally divergent concerning events at the hospital. According to defendants, McManus and plaintiff appeared in the Morton Hospital emergency room at approximately 3:35 a.m., without any prior notification. Affidavit of Philip M. Falkoff, M.D. at ¶ 3 (# 44); Defendant Morton Hospital, Inc.'s Answers to Plaintiff's Interrogatories at No. 11 (# 44). McManus presented the body cavity warrant to defendant Falkoff and Falkoff telephoned Thomas Porter, the hospital's acting president and administrator-on-call for advice. *Id.* at ¶¶ 3–4. Porter informed Falkoff of the hospital's consent to treat patient's policy and the requirement to act and comply when presented with a court order. *Id.* at ¶ 4; Affidavit of Thomas Porter at ¶ 3 (# 44). The hospital did not have any contract or agreement with the city regarding use of its facilities for body cavity searches, nor did it have a policy with regard to such searches. Def. Ans. at Nos. 5–6.

According to Falkoff, plaintiff did not object to the vaginal search, but refused to sign a release form. Falkoff Aff. at ¶ 6; Medical Records (# 44). She was allowed to undress in private, place herself on the pelvic table and don a sheet for modesty. Falkoff Aff. at ¶ 6. Unbeknownst to Falkoff, she allegedly was also allowed to go to the bathroom prior to the examination. Answers of Defendant, Phillip Falkoff, M.D., to Plaintiff's Interrogatories at No. 21 (# 46). Falkoff, in the presence of Nurse Diane Clark and Officer McManus, conducted a twenty second inspection of plaintiff's vagina, using a spotlight and speculum, which revealed an absence of foreign bodies. Falkoff Aff. at ¶ 6. Falkoff denies that he conducted a bimanual palpation of plaintiff's abdomen and vagina during the course of the examination or that he or Nurse Clark used or threatened physical force in order to conduct the search. *Id.* at ¶ 7.

Plaintiff denies that she consented to the body cavity search. Pl. Aff. at 3. She avers that upon her arrival at the hospital, a nurse, in the presence of Dr. Falkoff, told her she was going to get the "royal treatment," a complete physical from head to toe. When she refused to comply, Falkoff left the examining room, returning in a couple of minutes. In his absence, the nurse told plaintiff she could not be touched without her consent. *Id.* However, Falkoff, upon his return, informed plaintiff that there was a state trooper outside of the room and that plaintiff was going to be searched "one way or another." When plaintiff asked the nurse how far Falkoff was going to penetrate, the nurse allegedly responded, "Until your eyes pop out." *Id.*

Plaintiff continued to refuse consent. The nurse then pushed her down on the pelvic table and placed her legs in the stirrups. *Id.* Falkoff inserted a probe into her vagina, but did not find any evidence of foreign bodies. *Id.* at 4. He then inserted his fingers or another probe far into her vagina while pushing down on her stomach with his other hand. *Id.* When he finished, Falkoff allegedly leaned over plaintiff, asked her whether she was a "famous person," and then rushed out of the room. *Id.*

Plaintiff brought the instant action on June 26, 1987 against Furtado, Westcoat, the City of Taunton, Falkoff, and Morton Hospital, Inc., alleging that the affidavit for the body cavity search warrant was

facially deficient and that the search carried out pursuant to the warrant was unreasonable in both its basis and method of execution. Plaintiff also charged that the allegedly unconstitutional search was conducted pursuant to a custom or policy of the City of Taunton which exhibited a reckless disregard for the rights of plaintiff. Plaintiff did not allege, and has never argued, that Furtado drafted the warrant affidavit with deliberate falsity or malice or that the search of her apartment was unconstitutional. Plaintiff sought damages under 42 U.S.C. § 1983 and M.G.L. c. 12, § 11H plus costs and fees.

Defendants Furtado, Westcoat and the City of Taunton moved for summary judgment on grounds of qualified immunity and failure to state a claim. The Magistrate issued a Report and Recommendation in those defendants' favor. Defendants Falkoff and Morton Hospital subsequently moved for summary judgment on similar grounds and also received a favorable Report and Recommendation from the Magistrate. Plaintiff filed timely objections to almost all elements of both Reports and Recommendations.

## III. DISCUSSION

### A. *Summary Judgment Standard*

The court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure, which provides that the court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In addition, "the court must look at the record in the light most favorable to the party opposing the motion and must indulge all inferences favorable to that party." *Stepanischen v. Merchants Despatch Trans. Corp.*, 722 F.2d 922, 928 (1st Cir.1983).

However, to survive a summary judgment challenge on the basis of disputed material facts, the plaintiff must produce substantial evidence, going beyond the allegations of the complaint and supporting the claimed dispute, which would require a judge or jury to resolve the conflicting versions of the truth at trial. *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). *See also Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Matsushita Electrical Industrial Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986) (opponent must "do more than simply show that there is some metaphysical doubt as to the material facts").

In deciding motions for summary judgment, the court must make two inquiries: (1) whether the factual disputes are genuine, and (2) whether any fact genuinely in dispute is material. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* To determine if the dispute about a material fact is "genuine," the court must decide whether "the evidence is such that a reasonable [fact-finder] could return a verdict for the nonmoving party." *Id.* The party opposing the motion must "provide the court with 'some indication that he can produce the requisite quantum of evidence to enable him to reach the jury with his claim.'" *Arsenault v. Allegheny Airlines*, 485 F.Supp. 1373, 1378 (D.Mass.1980) (quoting *Hahn*, 523 F.2d at 468).

### B. *Contentions of the Parties*

The police defendants (Furtado, Westcoat and the City of Taunton) contend that plaintiff has failed to demonstrate a violation of § 1983 because the warrant affidavit was adequate to establish probable cause under the Fourth Amendment. Memorandum of Defendants in Support of Their Motion for Summary Judgment at 5–8 (# 18). Even if the affidavit did not establish probable cause, they argue, Fur-

tado is entitled to qualified immunity because he acted in good faith and the existence of probable cause was an issue on which officers of reasonable competence could disagree. *Id.* at 8–11. Westcoat and the City contend that they are entitled to summary judgment because, under the undisputed facts, their alleged inadequate supervision of search warrant applications did not comprise deliberate indifference to plaintiff's rights and was not causally connected to plaintiff's injury. *Id.* at 13–16. In addition, because Furtado was not a final policy-maker for the City, his single act of applying for an allegedly unconstitutional warrant could not create a municipal policy or custom sufficient to hold the municipality liable under § 1983. Reply Memorandum of Defendants at 5–7 (# 30); Supplementary Reply Memorandum of Defendants at 1–3 (# 36).

Plaintiff responds that the search authorized by the warrant was unreasonable on its face and that a person in Furtado's position could not have reasonably believed that the authorized search was reasonable. Memorandum in Opposition to Defendants' Motion for Summary Judgment at 9–14 (# 24) (citing *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (holding stomach pump of suspect unreasonable); *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (nonconsensual blood test permissible under limited circumstances)). Plaintiff also claims the unreasonableness of the procedure was exacerbated by the canine unit's failure to indicate the presence of narcotics on plaintiff during the earlier apartment search. *Id.* at 12. Further, plaintiff asserts, the warrant affidavit was facially deficient, and the search unreasonable, because it did not establish probable cause, suggest when the plaintiff might be carrying drugs in her vagina, indicate whether the requested search would be visual or mechanical, or describe the appearance of the allegedly hidden contraband. *Id.* at 11–20. Finally, plaintiff contends Westcoat and the City can be held liable either because the City delegated policy-making authority to Furtado in the area of warrant applications or because the City

and Westcoat, by not establishing standards and procedures for obtaining body cavity warrants, failed to adequately supervise Furtado, leading to plaintiff's injury. *Id.* at 20–22.

The medical defendants, Falkoff and Morton Hospital, Inc., contend that they are not liable under § 1983 because they played no role in obtaining and deciding to execute the search warrant and thus were not "state actors." Defendants' Memorandum in Support of Their Motion for Summary Judgment at 2–7 (# 42). Alternately, if Falkoff and the hospital are considered state actors, defendants argue they are entitled to qualified immunity because Falkoff conducted the ordered search in a reasonable and medically logical manner which did not violate any of plaintiff's clearly established constitutional rights. *Id.* at 7–17. They also claim neither Falkoff nor the hospital were under any obligation to inquire about the validity of the search warrant or the facts underlying its issuance. *Id.* at 8, 17–18.

Plaintiff argues in opposition that Falkoff assumed the role of a state actor by executing the vaginal search under the official auspices of the search warrant, in the absence of any consent or medical justification. Plaintiff's Memorandum in Opposition to Motion for Summary Judgment at 5 (# 45). Plaintiff claims Morton Hospital became a state actor by approving the execution of the search through Porter's interpretation of a hospital patient treatment policy which required obedience to court orders. *Id.* at 7. On the other hand, neither Falkoff nor the hospital are entitled to qualified immunity, because they are private entities, not public officials. *Id.* at 7–10 (citing *Downs v. Sawtelle,* 574 F.2d 1 (1st Cir.1978)). Further, plaintiff contends, whether or not they are entitled to qualified immunity, their execution of the warrant was unreasonable, and hence not immunized, because of their lack of inquiry into the circumstances surrounding the issuance of the warrant and seizure of the plaintiff, which would have revealed the lack of specificity in the warrant and the police's lack of basis for believing that

plaintiff was carrying drugs in her vagina. *Id.* at 9–12. Finally, plaintiff asserts Falkoff's execution of the warrant was more intrusive than necessary and was conducted in an unreasonably degrading and threatening manner. *Id.* at 13–15.

### C. *The Magistrate's Reports and Recommendations*

The Magistrate interpreted plaintiff's opposition to the police defendants' motion for summary judgment as arguing that a higher standard than probable cause applies to applications for body cavity search warrants. Report and Recommendation at 7 (Docket # 38).[1] The Magistrate rejected that argument and held that the warrant established probable cause that narcotics would be found hidden in plaintiff's apartment and in her vagina. *Id.* at 11–15. Even if probable cause was not established, qualified immunity barred plaintiff's suit against Furtado because the existence of probable cause was at least arguable and fell within the grey area designated as immunized in *Briggs v. Malley,* 748 F.2d 715 (1st Cir.1984), *aff'd,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). Report and Recommendation at 18–19. Finally, plaintiff failed to state a claim against Westcoat and the City because they were under no constitutional obligation to promulgate a set of rules concerning applications for body cavity searches embodying plaintiff's erroneous view that such searches require a justification greater than probable cause. *Id.* at 22–23.

With regard to the medical defendants' motion for summary judgment, the Magistrate recommended that Falkoff was a state actor for § 1983 purposes due to his conduct in carrying out the nonconsensual vaginal search. Report and Recommendation at 2–5 (Docket # 56). The Magistrate also concluded that Falkoff was entitled to official immunity, because it would be unjust to punish an ordinary citizen for obeying a seemingly valid court order. *Id.* at 6–13. He suggested that with regard to the

mere fact of executing the warrant, Falkoff was entitled to absolute, quasi-judicial immunity as one carrying out a court order, *id.* at 13–17, but that even under a qualified immunity standard, plaintiff's action against Falkoff was barred for the same reasons as the suit against Furtado, *id.* at 18–22.

With regard to the manner of the warrant's execution, the Magistrate recommended that Falkoff was entitled to qualified immunity. *Id.* at 22–27. In particular, the Magistrate reasoned that plaintiff's consent was irrelevant to the validity of the search, entitling Falkoff to suggest that force would be used in the absence of cooperation, that use of a probe was reasonable in the absence of contrary restrictions in the warrant, that comments attributed to the nurse were irrelevant to Falkoff's liability, and that Falkoff's "famous person" query could not affect the reasonableness of the already completed search. *Id.* at 25–27.

Finally, the Magistrate concluded that the hospital's liability could not be predicated upon respondeat superior, *id.* at 27 (citing *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)), and that the hospital was not a state actor because it neither undertook conduct normally reserved to the state nor was so intertwined with the state as to be deemed a state actor, *id.* at 28–29. The hospital, through Porter, did not authorize the search, but only informed Falkoff that the general policy of the hospital was to obey court orders. *Id.* at 29–30. Even if the hospital was a state actor and did cause a violation of plaintiff's constitutional rights, it would be entitled to qualified immunity for the same reasons as Falkoff in that its policy of obeying court orders did not violate any clearly established constitutional rights. *Burns v. Loranger,* 907 F.2d 233, 235–36 (1st Cir.1990).

---

**1.** In fact, plaintiff specifically disavows any such argument. Rather, she merely contends that "the greater the intrusion, the greater must be the reason for conducting a search." Plain-

tiff's Objections Pursuant to Rule 3(b) of Rules for United States Magistrates for the District of Massachusetts at 4–5 (# 39) (quoting *Blackburn v. Snow,* 771 F.2d 556, 565 (1st Cir.1985)).

### D. *Analysis*

#### 1. Detective Furtado is Entitled to Qualified Immunity

In *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), the Supreme Court held "that government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." The Court clarified this ruling in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), where it wrote:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent.

*Id.* at 640, 107 S.Ct. at 3039 (cites omitted). The Court of Appeals for the First Circuit has recently interpreted these holdings to establish a two-part objective test for qualified immunity claims:

> First, if the right asserted by the plaintiff was "clearly established" at the time of its alleged violation, we are required to assume that the right was recognized by the defendant official ...; second, we will deny the immunity claim if a reasonable official situated in the same circumstances should have understood that the challenged conduct violated that established right.

*Burns,* 907 F.2d at 235–236.

In this case, plaintiff asserts a right to be free from an unreasonable body cavity search conducted pursuant to a warrant issued on less than probable cause. Plaintiff thus implicates both prongs of the qualified immunity test, requiring the court to find whether she had a clearly established right to be free from manual body cavity searches under the circumstances of this case and whether a reasonable official in Furtado's position should have realized that his conduct violated plaintiff's Fourth Amendment rights, either because his warrant affidavit was facially deficient or because the search was otherwise unreasonable.

In *Briggs v. Malley,* 748 F.2d 715 (1st Cir.1984), the Court of Appeals for the First Circuit addressed the applicable standard of immunity for police officers conducting arrests pursuant to judicially approved warrants. The court held that the officers were not absolutely immunized by virtue of the intervening Magistrate's approval, but that due to the potential chill on their law enforcement functions, the officers were entitled to a broad-ranging qualified immunity.

> Applying the standard of official immunity enunciated in *Harlow,* we hold that *only* where an officer is "constitutionally negligent," that is, where the officer should have known that the facts recited in the affidavit did not constitute probable cause, will liability attach. Where the sufficiency of the facts fall into the grey area appropriate for judicial determination, submission of the affidavit to a Magistrate will insulate the officer from liability.

*Id.* at 721.

In affirming the Court of Appeals holding, the Supreme Court struck a similar chord:

> The *Harlow* standard is specifically designed to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment," and we believe it sufficiently serves this goal. Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).[2]

**2.** The Supreme Court stated in *Malley* that the    same standard applied to immunity from liabili-

"Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost." *Id.* at 345, 106 S.Ct. at 1098 (cite omitted).[3]

■ In this case, even if probable cause for the vaginal search was not established by Furtado's warrant affidavit, the application was not "so lacking in indicia of probable cause as to render official belief in its existence unreasonable."

Plaintiff strongly attacks several aspects of the warrant affidavit. She notes that the averments lack important details which a neutral Magistrate should wish to know, such as the number and dates of the Crime Stoppers calls and the names of the calling parties, the dates on which "known drug users" were seen entering her building, the basis for Furtado's assertion that the named individuals were "known drug users," and the reliability and basis of knowledge of the anonymous tipster who called Furtado following the June 14 raid and told him about plaintiff's alleged practice of hiding drugs in her vagina. Further, plaintiff challenges the weight and reliability of the CI's allegations on several grounds: the CI is admittedly a heroin user; the CI made an unreasonable inference that plaintiff removed drugs from her vagina when she went into the bathroom, because she could just as easily have retrieved them from the toilet box, a medicine chest or some other hiding spot; the CI's report that unidentified others informed him of plaintiff's alleged practice is unsupported hearsay; and Guzman's reported statement about plaintiff's practice was hearsay, obtained by one heroin user from another, which the police did not even attempt to verify with Guzman.

Plaintiff's arguments are not frivolous. However, probable cause is a "practical nontechnical conception" whose existence is to be determined from the "totality of the circumstances" known to an investigating officer. *Illinois v. Gates,* 462 U.S. 213, 230–31, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983). There was probable cause to search plaintiff if "given all the circumstances, there [was] a fair probability that contraband or evidence [would] be found." *United States v. White,* 766 F.2d 22, 25 (1st Cir.1985) (quoted in *Burns,* 907 F.2d at 236 (no liability for warrantless strip search of plaintiff for narcotics)).

In this case the totality of the circumstances evinced in Furtado's affidavit supported a "fair probability" that plaintiff would be found carrying narcotics in her vagina, despite the weaknesses in each individual affidavit assertion. As defendants admit, the anonymous tip concerning plaintiff's alleged practice was clearly insufficient, by itself, to establish probable cause. However, it tended to corroborate the CI's subsequent suggestion that the police perform a body cavity search. The CI had reportedly provided reliable information to the police in the past, including data leading to a reportedly successful search of plaintiff's apartment and the indictment of plaintiff and her husband on drug charges. The CI's status as a drug-user, while damaging to his credibility, cannot be held fa-

---

ty for submission of deficient affidavits for search, as well as arrest, warrants. 475 U.S. at 344 n. 6, 106 S.Ct. at 1097 n. 6.

3. Plaintiff relies on *B.C.R. Transport Co., Inc. v. Fontaine,* 727 F.2d 7, 10 (1st Cir.1984), for the proposition that "the question of qualified immunity ..., being one turning on the reasonableness of [defendant's] conduct, [is] properly left for the jury to resolve." However, *Fontaine* was decided before either *Malley* or *Anderson,* which re-emphasized the thrust of *Harlow* that determinations of immunity should be made by the court as early in the judicial proceedings as possible. *See Anderson,* 483 U.S. at 640 n. 2, 107 S.Ct. at 3039 n. 2 ("the driving force behind *Harlow's* substantial reformulation of qualified

immunity principles [was] that 'insubstantial claims' against government officials be resolved prior to discovery and on summary judgment if possible"), n. 6.

However, "although the qualified immunity determination is a legal question it is not to be answered in the abstract but in reference to the particular facts of the case." *Rakovich v. Wade,* 850 F.2d 1180, 1202 (7th Cir.1988). Thus, if there are material factual disputes concerning a defendant's conduct, the court may use special interrogatories to have a jury decide relevant facts so the court can then determine whether such conduct violated clearly established rights. *Id.* at n. 15. There are no such material disputed facts in this case.

tal. If it were, almost all narcotics warrants based on the reports of confidential informants would be invalidated.

In addition, the CI's report of Guzman's statements concerning plaintiff's carrying of narcotics in her vagina is given additional weight by Guzman's close alliance with plaintiff and her husband, which was demonstrated by his numerous trips into their apartment building, numbering ten on one particular night. The failure of the police to verify Guzman's reported statements with Guzman himself was also reasonable given this close connection with plaintiff and the complete lack of evidence that Guzman ever acted as an informant or otherwise cooperated with the police. Even if these facts, taken together, do not establish probable cause to believe that plaintiff was carrying narcotics in her vagina, they certainly place the issue into the grey area in which officers of reasonable competence could disagree.[4]

■ Even assuming that probable cause existed, however, plaintiff argues that the search of her vagina may have been so unreasonable as to violate a clearly established constitutional right. This argument has some merit, but is ultimately unavailing.

In *Winston v. Lee,* 470 U.S. 753, 759, 105 S.Ct. 1611, 1615, 84 L.Ed.2d 662 (1985), the police sought a court order authorizing involuntary surgery on a criminal defendant to remove a bullet allegedly fired by the victim of the crime. In affirming the lower courts' refusal to allow the order, the Supreme Court wrote, "A compelled surgical intrusion into an individual's body for evidence ... implicates expectations of privacy and security of such magnitude that the intrusion may be 'unreasonable' even if likely to produce evidence of a crime." The Court stated:

> The reasonableness of surgical intrusions beneath the skin depends on a case-by-case approach, in which the individual's interests in privacy and security are weighed against society's interests in conducting the procedure. In a given case, the question whether the community's need for evidence outweighs the substantial privacy interests at stake is a delicate one admitting of few categorical answers.

*Id.* at 760, 105 S.Ct. at 1616. The Court ultimately affirmed the lower courts' rulings in light of the indeterminate, though slight, health risk to the defendant, the extensive intrusion on the defendant's privacy and bodily integrity, and the availability of ample other evidence of defendant's guilt. *Id.* at 763–66, 105 S.Ct. at 1618–20.

In undertaking its analysis, the *Winston* Court relied on the Supreme Court's earlier opinion in *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). In that case, the Court affirmed the admissibility of evidence obtained through a warrantless, involuntary blood test of a suspected drunk driver. The Court cautioned, however:

> [T]hat we reach this judgment only on the facts of the present record. The integrity of an individual's person is a cherished value of our society. That we today hold that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions.

*Id.* at 772, 86 S.Ct. at 1836.

Despite these dignitary concerns, the Supreme Court has upheld visual body cavity searches of inmates, *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), and has suggested that visual and manual cavity searches of entrants at the border are appropriate given the proper level of suspicion, *United States v. Montoya de Hernandez,* 473 U.S. 531, 541 n. 4,

---

4. The warrant was not facially unreasonable due to its failure to specify the means to be used to execute the search or the likely size and shape of the objects to be found. The requirement that a doctor execute the search strongly indicated that some sort of manual probe would be used, the choice of which was better left in the hands of the medical professional. The search area designated by the warrant was such that a detailed and unavoidably speculative description of the items to be found was not reasonably necessary; any foreign object found in plaintiff's vagina could reasonably be suspected of carrying narcotics.

105 S.Ct. 3304, 3310 n. 4, 87 L.Ed.2d 381 (1985) (declining to decide what level of suspicion is required for body cavity searches at the border). The First Circuit, on the other hand, has expressed an extreme distaste for such procedures, stating that "body cavity searches are ' "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission," ' " *Blackburn v. Snow,* 771 F.2d 556, 564 (1st Cir.1985) (quoting *Marybeth G. v. City of Chicago,* 723 F.2d 1263, 1273 (7th Cir.1983)), and that they are " 'the greatest personal indignity' searching officials can visit upon an individual," *id.* (quoting *Bell,* 441 U.S. at 594, 99 S.Ct. at 1902–03 (Stevens, J., dissenting)).

In *Blackburn,* the First Circuit struck down prison regulations authorizing routine strip and visual body cavity searches of visitors. The court emphasized that those cases, like *Bell,* which affirmed the constitutionality of body cavity searches in various circumstances did not involve any touching of the searched individual. *Id.* at 565 n. 5. It expressed a similar set of concerns in *Bonitz v. Fair,* 804 F.2d 164, 173 (1st Cir.1986), where it held that the "body-cavity search of female inmates conducted by police officers, involving touching, conducted in a non-hygienic manner and in the presence of male officers, was a clearly established violation of the inmates' fourth amendment right to be free from unreasonable search."

Neither *Blackburn* nor *Bonitz,* however, dealt with body cavity searches arguably supported by probable cause. It appears there are not any cases in which a court has rejected a body cavity search supported by this high a level of suspicion. To the contrary, in at least two other cases, the courts have ruled that visual body cavity searches are constitutional when supported by probable cause and conducted by police officers. In *Salinas v. Breier,* 695 F.2d 1073, 1085 (7th Cir.), *cert. den.* 464 U.S. 835, 104 S.Ct. 119, 78 L.Ed.2d 118 (1983), the court held that it was reasonable under the Fourth Amendment for police officers "with probable cause to believe that a controlled substance is hidden in a person's

rectum or vagina, without first obtaining a warrant and without obtaining the services of a doctor under sanitary conditions, to require the person, without the use of force, to bend forward deeply at the waist so as to expose her rectum and vagina to visual inspection." In *Security and Law Enforcement Employees, Dist. Council 82 v. Carey,* 737 F.2d 187, 208 (2nd Cir.1984), the court stated that it would require a search warrant based on probable cause for visual body cavity searches of corrections officers.

The search warrant in this case, which was not limited on its face to a visual search and which in its required execution by a doctor clearly anticipated a manual or physical probe, obviously implicates privacy and dignitary concerns under *Schmerber* and *Winston* greater than those present in the visual body cavity search cases. *See Bonitz,* 804 F.2d at 173 (emphasizing visual nature of searches which had been upheld in the past); *Blackburn,* 771 F.2d at 565 n. 5 (same). Nevertheless the First Circuit did not hold in *Blackburn* or *Bonitz* that a manual body cavity search, justified by probable cause and performed by medical personnel in a hygienic setting, was unconstitutional. In any event, such a conclusion, even if accurate, was not clearly established by those cases or *Schmerber* and *Winston.*

The privacy and security concerns implicated by the vaginal probe fall somewhere between those present in *Schmerber* and *Winston.* The intrusiveness of the procedure is greater than a blood test, but less than surgical removal of a foreign object. The duration and loss of control over one's body is also less severe than in the case of the surgery, which involves application of a general anaesthetic. No health risk is present. Privacy concerns are perhaps greater than with surgery, although a warrant requirement that the search be executed by a doctor in a hospital setting minimizes the infringement.

On the other side of the balance, society's interest in the punishment and prevention of drug trafficking weighs in favor of the permissibility of manual body cavity

searches in certain cases. It is true that in this case other, less intrusive means of investigation and prosecution seem to have been available to defendants. Plaintiff was already under indictment and the police could have relied solely on evidence uncovered in the apartment searches to build a case against her. Alternately, they could have arranged a controlled buy with the CI, although the warrant affidavit alleges that at the time of the vaginal search, plaintiff was not allowing buyers to leave her apartment with purchased narcotics. However, the existence of these alternate investigatory routes does not render the vaginal search unreasonable under the circumstances as a whole, where the police may not have been otherwise able to detect plaintiff's continued trafficking in small amounts of drugs which she kept hidden in her vagina. Nor could the police be sure that a purely visual search would reveal the presence of hidden quantities of narcotics.

In light of the close and complicated balance of the *Schmerber/Winston* factors, plaintiff did not have a clearly established constitutional right to be free from a manual body cavity search conducted by a doctor, in a private and hygienic setting, pursuant to a warrant issued on probable cause. To the contrary, in *United States v. Velasquez*, 469 F.2d 264 (9th Cir.1972), a border case not dispositive of the instant situation, the Ninth Circuit affirmed the constitutionality of a rectal probe conducted by a doctor at the request of customs agents where the agents had a clear indication that defendant was smuggling drugs in his rectum.

Further, Furtado's conduct in seeking and initiating execution of the warrant did not become objectively unreasonable in light of the time of execution or the alleged failure of the dog to alert to any narcotics on plaintiff's person. First, Furtado apparently obtained the warrant as rapidly as he could upon receiving the CI's tip about a delivery of black heroin by plaintiff's husband. Second, dog sniffs, while recognized means of drug detection, are hardly infallible, and the alleged negative result in this case could not, by itself, eliminate the probable cause that otherwise existed.

Therefore, Detective Furtado is entitled to qualified immunity because a reasonable person in his position would not have known he was violating any clearly established constitutional rights of plaintiff.

### 2. Chief Westcoat and the City of Taunton Are Not Liable

Plaintiff argues that Chief Westcoat and the City of Taunton are liable under § 1983 because either Furtado's decision to seek the body cavity search warrant comprised a municipal policy or because the City, through Westcoat, inadequately supervised Furtado in the obtaining of search warrants. Westcoat and the City are entitled to summary judgment as a matter of undisputed fact and law.

First, to the extent that Furtado acted reasonably in obtaining and initiating execution of the search warrant, Westcoat and the City cannot be held liable because there would be no causal connection between any deficient city policy and a deprivation of plaintiff's rights. *Burns*, 907 F.2d at 239.

Second, even if Furtado did not act in an objectively reasonable manner, his actions cannot be deemed to establish a municipal policy. Although it is possible that an unconstitutional policy or custom may be inferred from a single decision or act, *Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), the isolated action must be taken by a municipal official with "final policy-making authority" in the relevant area of the city's business, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 923, 99 L.Ed.2d 107 (1988) (plurality opinion). Here, although Furtado had *discretion* to seek narcotics search warrants on his own initiative, as did seven other City of Taunton police officers, he clearly did not have final policy-making authority under state law in this area. *Id.* at 127, 130, 108 S.Ct. at 925, 927.

Third, there is no evidence of a policy of inadequate supervision on the part of Westcoat and the City. This was the first

body cavity search warrant sought by a Taunton police officer. No evidence seized pursuant to a warrant obtained by Furtado had ever been suppressed. Furtado Aff. at ¶ 4. Only one of the 25 to 30 warrant searches executed during Westcoat's year-and-a-half as chief prior to August 21, 1986 had been held unconstitutional. Westcoat Ans. at Nos. 22–23.

In *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Supreme Court stated that a plaintiff may predicate municipal liability under § 1983 on a failure to train "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." "Only where a failure to train reflects a "deliberate" or "conscious" choice by a municipality—a "policy" as defined by our prior cases—can a city be liable for such a failure under § 1983." *Id.* at 389, 109 S.Ct. at 1205.

> In resolving the issue of a city's liability, the focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program.... Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.... And plainly, adequately trained officers occasionally make mistakes; the fact that they do so says little about the training program or the legal basis for holding the city liable.

*Id.* at 390–91, 109 S.Ct. at 1205–06. Although the Supreme Court discussed only failure to train claims, the same standard applies to failure to supervise arguments. *See Bordanaro v. McLeod*, 871 F.2d 1151, 1158 (1st Cir.1989) (discussing municipality's liability for inadequate recruitment,

training, supervision and discipline under *City of Canton* ).

■ In this case, plaintiff has presented no evidence, other than the single alleged incident of which she was the victim, that Taunton's policy of allowing a select group of experienced officers to seek search warrants on their own initiative demonstrated "deliberate indifference" to the rights of its citizens. *Cf. Burns, supra,* 907 F.2d at 239 (granting summary judgment for municipality where plaintiff presented no evidence of any deficient policy or custom regarding strip searches). Plaintiff has not demonstrated or even alleged any pattern of unconstitutional searches, either by Furtado or the Taunton police department in general. Nor has a series of body cavity searches been demonstrated sufficient to alert the city to the need for special training or supervision. In short, there has been no showing "that there were constitutional violations so widespread and a failure to discipline so pervasive that they allow an 'inference of supervisory encouragement, condonation or even acquiescence.'" *Santiago v. Fenton,* 891 F.2d 373, 382 (1st Cir.1989) (quoting *Voutour v. Vitale,* 761 F.2d 812, 820 (1st Cir.1985)).[5] Therefore, summary judgment for Westcoat and the City must be granted.

### 3. Doctor Falkoff is A State Actor, But Entitled to Qualified Immunity

To state a claim under § 1983, plaintiff must show that the alleged deprivation of her constitutional right was committed by a person acting under color of state law. 42 U.S.C. § 1983. The Supreme Court has clearly held that if a person's conduct satisfies the state action requirement of the Fourteenth Amendment, it will also satisfy the standard of liability for § 1983. *West v. Atkins,* 487 U.S. 42, 49, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988) (citing *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 935, 102 S.Ct. 2744, 2752, 73 L.Ed.2d 482 (1982)). "The Court has ruled that 'a State normally

---

**5.** In this context it may be noted that plaintiff's report of Officer McManus's alleged expressions of surprise and disgust, while largely irrelevant, supports the conclusion that the City's alleged failure to adequately supervise the warrant application process did not amount to deliberate indifference to the rights of its citizens.

can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'" *Id.* at 52 n. 10, 108 S.Ct. at 2257 n. 10 (quoting *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982)). In addition, the Supreme Court has "found state action present in the exercise by a private entity of powers traditionally exclusively reserved to the state." *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 352, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1975).

The Supreme Court has adopted a decidedly functional approach to applying these tests. Thus, in *West,* the Court held that a private physician who was under contract to provide medical services to inmates in a state prison system acted "under color of state law" for § 1983 purposes when treating an inmate. 487 U.S. at 42, 108 S.Ct. at 2251. The Court wrote:

... *It is the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State. Whether a physician is on the state payroll or is paid by contract, the dispositive issue concerns the relationship among the State, the physician, and the prisoner.* Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights. The State bore an affirmative obligation to provide adequate medical care to West; the State delegated that function to respondent Atkins; and respondent voluntarily assumed that obligation by contract.

Nor does the fact that Doctor Atkins' employment contract did not require him to work exclusively for the prison make him any less a state actor than if he performed those duties as a full-time, permanent member of the state prison medical staff. *It is the physician's function while working for the State,*

*not the amount of time he spends in performance of those duties or the fact that he may be employed by others to perform similar duties, that determines whether he is acting under color of state law....*

*Id.* at 56, 108 S.Ct. at 2259.

■ In the instant case, Dr. Falkoff, though not under contract to the state, clearly functioned as a state actor when performing the vaginal search of plaintiff. The scope and purpose of his examination were determined solely by the state's investigatory goals and his actions were justified solely by the existence of the body cavity warrant; Falkoff functioned in the event purely as an adjunct to the normal police search squad. He exercised the power of coercive search traditionally reserved exclusively to the state, *Jackson,* 419 U.S. at 352, 95 S.Ct. at 454, and did so because of the "significant encouragement" or "coercive power" represented by the search warrant, *Blum,* 457 U.S. at 1004, 102 S.Ct. at 2785. Failure to hold him responsible as a state actor under these circumstances would leave the state free to delegate a wide range of search functions to private parties, such as doctors, landlords and building superintendents, stripping private citizens of their means to vindicate their constitutional rights. *See West,* 487 U.S. at 56 n. 14, 108 S.Ct. at 2259 n. 14.

Falkoff's reliance on *Green v. Truman,* 459 F.Supp. 342 (D.Mass.1978), is not persuasive. In that case, the court held that a private pediatric hematologist was not a proper defendant in a § 1983 suit alleging violation of parents' rights to determine the appropriate medical treatment for their minor child. The court reasoned that neither the doctor's resort to state judicial process to overcome the parents' treatment wishes nor his subsequent execution of a court order authorizing chemotherapy converted him into a state actor. *Id.* at 344–45. "[A] court order that places legal custody of the child with the DPW for chemotherapy treatment and further provides that *either* Dr. Truman *or* any board-certified hematologist of plaintiffs' choosing shall supervise such treatment ... does not clothe Dr.

Truman with the authority of state law necessary to satisfy the state actor requirement." *Id.* (emphasis in original).

*Green* was decided before the Supreme Court's decision in *Lugar, supra,* which held that private parties resorting to an unconstitutional state attachment process were state actors and could be found liable under § 1983. Thus, *Green's* ruling that the doctor's resort to the state judicial process could not be the basis for § 1983 liability is thrown into some doubt. In addition, the provision of medical services at issue in *Green* was not traditionally the exclusive province of the state, and the discretion involved in implementing the treatment was primarily medical rather than political or legal in nature. Here, by contrast, the vaginal examination was motivated solely by concerns of crime detection and punishment which have always been peculiarly associated with the police power of the state. The fact that the warrant did not designate Dr. Falkoff specifically to conduct the search does not mean that he was not clothed with the authority of state law when he undertook, voluntarily or otherwise, to execute its terms.

■ Assuming Falkoff operated under color of state law, a question remains whether he is entitled to qualified immunity, both as a general matter and under the specific circumstances of this case.

On its face, § 1983 allows for no immunities or good faith defenses. However, the Supreme Court, reasoning that Congress did not mean to abrogate all common law immunities, initially recognized the survival of immunities which were well-established at common law and consistent with the purposes of § 1983. *See Owen v. City of Independence,* 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980). The Supreme Court has moved steadily away from this limited approach, however, as it acknowledged in *Anderson:*

Although it is true that we have observed that our determinations as to the scope of official immunity are made in the light of the "common-law tradition," we have never suggested that the precise contours of official immunity can and

should be slavishly derived from the often arcane rules of the common law. That notion is plainly contradicted by *Harlow,* where the Court completely reformulated qualified immunity along principles not at all embodied in the common law, replacing the inquiry into subjective malice so frequently required at common law with an objective inquiry into the legal reasonableness of the official action. As we noted before, *Harlow* clearly expressed the understanding that the general principle of qualified immunity it established would be applied "across the board."

483 U.S. at 644–45, 107 S.Ct. at 3041–42.

Whether qualified immunity exists for private persons under § 1983 is an issue never decided by the Supreme Court. In *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), the Court declined to address the issue in the context of a private entity which was held potentially liable under § 1983 for discriminatory conduct jointly engaged in with state officials. "Nor do we mean to determine at this juncture whether there are any defenses available to defendants in § 1983 actions like the one at hand." *Id.* at 174 n. 44, 90 S.Ct. at 1617 n. 44. Significantly, the Court cited at the end of this statement to *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), a case in which the Court recognized qualified immunity for police officers against claims of false arrest.

The Court declined to decide the issue again in *Lugar,* in which the state action requirement was satisfied solely by the conduct of the private defendants rather than by their joint participation with public officials. Responding to a dissenting opinion, the Court wrote:

Justice Powell is concerned that private individuals who innocently make use of seemingly valid state laws would be responsible, if the law is subsequently held to be unconstitutional, for the consequences of their actions. In our view, however, this problem should be dealt with not by changing the character of the cause of action but by establishing

an affirmative defense. A similar concern is at least partially responsible for the availability of a good-faith defense, or qualified immunity, to state officials. We need not reach the question of the availability of such a defense to private individuals at this juncture.

457 U.S. at 942 n. 23, 102 S.Ct. at 2756 n. 23 (citing *Adickes*, 398 U.S. at 174 n. 44, 90 S.Ct. at 1617 n. 44).

Since *Lugar*, several Courts of Appeals have addressed the existence of qualified immunity for private defendants in suits premised on the defendants' use of unconstitutional attachment statutes. Three Circuits have ruled in favor of immunity. *See Jones v. Preuit & Mauldin*, 851 F.2d 1321 (11th Cir.1988) (en banc) *vacated on other grounds*, 489 U.S. 1002, 109 S.Ct. 1105, 103 L.Ed.2d 170 (1989); *Buller v. Buechler*, 706 F.2d 844 (8th Cir.1983); *Folsom Investment Co. v. Moore*, 681 F.2d 1032 (5th Cir. Unit A 1982). The Sixth Circuit has concluded that private defendants are not entitled to qualified immunity in § 1983 actions, both because they were not immune to suit at common law and because the public policy goals served by official immunity are not implicated when private defendants are sued. *Duncan v. Peck*, 844 F.2d 1261, 1264 (6th Cir.1988). In particular, *Duncan* noted that private defendants threatened with monetary liability under § 1983 "do not face the dilemma of being required by law to use their discretion in a way that might unfairly expose them to lawsuits," nor is the exercise of their discretion undesirably chilled "because a private party is governed only by self-interest and is not invested with the responsibility of executing the duties of a public official in the public interest." *Id.* The *Duncan* court did recognize a good-faith affirmative defense of reliance on attorney's advice, however, which was successfully asserted by the defendants on summary judgment. *Id.* at 1267–68; *see also Howerton v. Gabi-*

ca, 708 F.2d 380, 385 n. 10 (9th Cir.1983) (no good faith immunity for landlords in § 1983 unlawful eviction action; availability of good faith affirmative defense left open on remand).

The First Circuit addressed the issue of immunity for private defendants in *Downs v. Sawtelle*, 574 F.2d 1 (1978), a pre-*Harlow* case in which the court discussed the liability of various defendants for the nonconsensual sterilization of the plaintiff. Plaintiff in this case relies heavily on the section of the opinion discussing the unavailability of an immunity defense for plaintiff's sister/guardian, who initiated the steps leading to her sterilization. The court held the sister liable on the "concerted action" theory of *Adickes*, then stated:

> To place this court's imprimatur upon an immunity in favor of a private individual could in many instances work to eviscerate the fragile protection of individual liberties afforded by the statute. Private parties simply are not confronted with the pressures of office, the often split-second decisionmaking or the constant threat of liability facing police officers, governors and other public officials. Whatever factors of policy and fairness militate in favor of extending some immunity to private parties acting in concert with state officials were resolved by Congress in favor of those who claim a deprivation of constitutional rights. Consequently, we hold that the [good-faith immunity] defense is not available to Roberta Sawtelle and that her liability is to be determined by the jury without regard to any claim of good faith.

*Id.* at 15–16.[6]

However, *Downs* does not dispose of the instant case. First, it pre-dated *Harlow*, which expanded official immunity to almost all public employees, and *Lugar*, which at the very least suggested that qualified immunity or a good-faith defense was available to private defendants.[7] Second, the

---

**6.** This portion of the opinion only obtained the support of two of the three panel judges. Chief Judge Coffin, dissenting in part, disagreed with the majority's holding that a private person could be held liable even if the public officials with whom she acted in concert were qualified-

ly immune from suit. *Id.* at 16 (Coffin, J., dissenting).

**7.** That *Harlow* might have influenced the panel's reasoning in *Downs* is demonstrated by the First Circuit's holding in the latter case that state

*Downs* court, without discussion, affirmed the district court's holding that the defendant chief of staff of the defendant private hospital could assert a qualified immunity defense, indicating that not all technically private defendants are excluded from good faith immunity. 574 F.2d at 11. The hospital was held to be a state actor not because it acted in concert with public officials in allegedly violating plaintiff's rights, like plaintiff's sister, but because it was highly interdependent with the state in terms of funding, regulation, governance, and disbursement of assets and profits. *Id.* at 6–8.

In light of *Harlow* and subsequent Supreme Court decisions, this court finds Dr. Falkoff is entitled to assert a defense of qualified immunity in this case. He is being held liable as a state actor for exercising functions of search and seizure traditionally within the exclusive police power of the state. The qualified immunity available to police officers in this context is well-recognized by the courts, *see Malley, supra*. A private doctor should be entitled to no less protection when called upon by the courts and the state · to perform searches that regular police cannot reasonably and properly perform. Put another way, the same common law predicates which the Supreme Court found to support qualified immunity in *Malley* should be deemed sufficient to support qualified immunity for a private doctor when he is acting as a police investigator. This conclusion is also in accord with the Supreme Court's emphasis on functional analysis under § 1983 as expressed in *West, supra,* and *Harlow,* 457 U.S. at 811, 102 S.Ct. at 2734 (characterizing immunity decisions of the Court as "functional").

Furthermore, the public policy considerations recognized by the courts in assessing claims of immunity are served by an extension of immunity in this case. The private doctor confronted with a warrant authorizing a body cavity search is not in a similar position to a private party who employs an unconstitutional statute in its own favor,

*see Duncan,* 844 F.2d at 1264; *Howerton,* 708 F.2d at 380, or otherwise conspires with public officials to accomplish private goals, *see Adickes,* 398 U.S. at 144, 90 S.Ct. at 1598; *Downs,* 574 F.2d at 1. Rather, the doctor is subject to strong official persuasion, if not a binding legal obligation, to perform the authorized search. In addition, he or she is motivated in such instances by the desire or compulsion to aid in the criminal investigatory process rather than to advance selfish concerns. Exposing private doctors to § 1983 liability without a shield of qualified immunity would thus be unfair and would deter them from fully and faithfully executing valid warrants. In light of the practical and legal constraints implicated by body cavity searches and other invasive search procedures, a reluctance or refusal to participate on the part of medical professionals would signal a loss to society of these crime detection techniques. *See DeVargas v. Mason & Hanger–Silas Mason Co., Inc.,* 844 F.2d 714, 722 (10th Cir.1988) ("when private party defendants act in accordance with the duties imposed by a contract with a governmental body, perform a governmental function, and are sued solely on the basis of those acts performed pursuant to contract, qualified immunity is proper").

In his Report and Recommendation, the Magistrate found that Falkoff was entitled to absolute quasi-judicial immunity with regard to the mere fact of executing the search, as opposed to the manner of execution. The Magistrate analogized the position of the doctor to that of other officers of the court, such as court clerks or court-appointed receivers, who merely carry out the court's orders. *See Slotnick v. Garfinkle,* 632 F.2d 163, 166 (1st Cir.1980) (court clerk who filed plaintiff's commitment papers and state hospital superintendent who maintained plaintiff's commitment were absolutely immune since they "were in all their actions carrying out the official directives of a judge"); *Kermit Constr. Corp. v. Banco Credito y Ahorro Ponce-*

---

social workers could not assert a claim of immunity. The court's assertion that the Supreme Court "has never attempted to articulate a wholesale immunity for all state officials" was clearly invalidated by the *Harlow* decision. 574 F.2d at 13.

*no,* 547 F.2d 1, 3 (1st Cir.1976) (court-appointed receiver absolutely immune when executing court orders); *Coverdell v. Dept. of Social & Health Services,* 834 F.2d 758, 765 (9th Cir.1987) (social worker absolutely immune when apprehending child pursuant to court order). "The fearless and unhesitating execution of court orders is essential if the court's authority and ability to function are to remain uncompromised." *Coverdell,* 834 F.2d at 765. As the First Circuit wrote with respect to a court-appointed receiver:

> To deny him [absolute] immunity would seriously encroach on the judicial immunity already recognized by the Supreme Court.... It would make the receiver a lightning rod for harassing litigation aimed at judicial orders. In addition to the unfairness of sparing the judge who gives an order while punishing the receiver who obeys it, a fear of bringing down litigation on the receiver might color a court's judgment in some cases.

*Kermit Constr. Co.,* 547 F.2d at 3.

In view of this court's ruling with regard to qualified immunity it is not necessary or appropriate to finally decide the merits of the Magistrate's analysis, but the court notes that it may as a general matter state an erroneously broad principle. While *Malley,* 475 U.S. at 335, 106 S.Ct. at 1093, addressed only the situation of a police officer *applying* for a deficient arrest warrant, the import of the Supreme Court's decision was that judicial approval of a search or arrest warrant did not absolutely shield an officer from liability for *executing* an obviously invalid warrant. This is suggested both from the Court's language and from its reliance on *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In *Malley,* the Court reasoned that a police officer seeking a warrant on the basis of an obviously deficient affidavit would not be immunized by magisterial approval of the warrant. "The officer ... cannot excuse his own default by pointing to the greater incompetence of the Magistrate." 475 U.S. at 346 n. 9, 106 S.Ct. at 1098 n. 9. There seems to be no more reason to excuse the officer who executes an obviously deficient or invalid warrant merely because it has been erroneously approved by a Magistrate or judge.

This point is suggested even more clearly in *Leon,* a case addressing the good faith exception to the exclusionary rule. *Leon* established that the good faith exception would not apply where the warrant affidavit was falsely or recklessly made or lacked all reasonable indicia of probable cause. 468 U.S. at 923, 104 S.Ct. at 3421. Nor would the exception apply where the warrant itself was facially invalid. "Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient—*i.e.,* in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Id.*

▪ In a similar manner, a physician functioning in the role of a police investigator should be held liable when executing a warrant which is so facially deficient under existing law that he cannot reasonably presume its validity. For example, a doctor should be no more *absolutely* immune for executing a warrant ordering surgical removal of a bullet, *see Winston,* 470 U.S. at 753, 105 S.Ct. at 1612–13, or pumping of a drug suspect's stomach, *see Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), than a police officer who pursues such a warrant. The role of the doctor in such circumstances is much more akin to that of the law enforcement official than the court clerk or receiver who are merely arms of the judicial process. Thus, the issue is most appropriately analyzed as a question of *qualified* immunity.

A private physician should not, however, be required to look behind an objectively reasonable and facially valid warrant to determine if it was based on an affidavit establishing probable cause. As stated by the Ninth Circuit in the context of a motion to suppress:

> The exclusionary rule is directed at lawless police activity, and we cannot say this purpose would be advanced by requiring the physician to share the customs agent's knowledge of all the facts justifying the search.... Since a physi-

cian is required to have no knowledge of the law of search and seizure to practice his profession, any such enumeration of the facts by the agents to the doctor would be a meaningless ritual, and would be comparable to requiring the police to recite to a locksmith the basis for their probable cause before he could legally open a lock for them. We cannot see how such a recitation would serve to strengthen the guarantees of the Fourth Amendment.

*Velasquez*, 469 F.2d at 266. It is already a substantial imposition to require physicians to learn the constitutional restrictions on invasive bodily searches, although one warranted by their necessary and integral role in the conduct of such examinations. Requiring them also to learn the legal parameters of probable cause and to inquire into its existence in every body cavity search case would be unfair to them and would unreasonably chill the conduct of important police investigations.

■ In the instant case, for reasons discussed earlier, plaintiff did not have a clearly established constitutional right to be free from manual body cavity searches performed by a licensed physician. Thus, the search warrant was facially valid and reasonable and Falkoff is immunized from liability for the mere fact of performing the search under a qualified immunity standard.

■ The manner in which Falkoff conducted the search, however, presents a separate question. Plaintiff can point to four alleged facts to demonstrate that Falkoff's search was unreasonable in manner and scope and therefore violated her Fourth Amendment rights. However, looking at the record in the light most favorable to plaintiff and assuming, without deciding, her contentions are true, Dr. Falkoff also has qualified immunity for the manner of the search.

First is Falkoff's alleged threat of force in executing the search, specifically his statements that a state trooper was waiting outside of the examination room and that the search would be performed whether plaintiff cooperated or not. As the Mag-

istrate concluded, however, plaintiff has not pointed to any precedent to suggest that an acceptable amount of force may not be used to execute a valid body cavity warrant in the same manner as any other warrant. The doctor's mere threat of force, therefore, was not unreasonable.

Second is Falkoff's alleged bimanual palpation of plaintiff's abdomen and vagina. Falkoff denies performing this procedure; thus its purpose and necessity are not explained. However, plaintiff does not allege that the procedure was unduly painful or humiliating, compared to the remainder of the search, or that it was done for an improper purpose, such as punishment or harassment, rather than for the permissible goal of searching plaintiff's vagina. Thus, the alleged performance of the procedure did not render the search unreasonable.

Third is the nurse's alleged statement that Falkoff would penetrate so far that plaintiff's eyes would pop out, and fourth is Falkoff's alleged query whether plaintiff was a famous person. The Magistrate discounted both of these statements, the former on the ground that the nurse's comments could not be attributed to Falkoff and the latter on the ground that it occurred after the search was completed. It may not be appropriate to dispose of these statements so simply. The nurse's comment can arguably be attributed to Falkoff through some sort of agency relationship or perhaps as an adoptive admission. His own purported comment, though allegedly made after the completion of the physical search, certainly colored the atmosphere of the search procedure as a whole. If made, both these statements, would have had the combined effect of enhancing the humiliation and harassment inherent in the vaginal search.

Nevertheless, that these two isolated comments, without more, would be insufficient to eliminate Falkoff's qualified immunity. Plaintiff contends that the physical examination was unreasonable per se, but does not allege, assuming the propriety of manual searches in the abstract, that the search in this case was unreasonably or unnecessarily painful, long or intrusive.

Nor does plaintiff allege that the intrusion on her privacy was exacerbated by the presence of unnecessary persons. The alleged statements, if made, may open the nurse and Falkoff to charges of poor taste. They do not, by themselves, leave Falkoff liable for an alleged violation of plaintiff's constitutional rights.

### 4. Morton Hospital, Inc. Is Not Liable

Plaintiff alleges that Morton Hospital, Inc. caused her injury by authorizing Falkoff to violate her Fourth Amendment rights through performance of an unconstitutional search. Even if the hospital's actions can be interpreted as an authorization, however, the hospital is entitled to summary judgment for reasons largely stated above.

Plaintiff denies that she is seeking to hold the hospital liable on a theory of respondeat superior. Pl. Opp. at 7 (# 45). Indeed, it seems unlikely that such a theory is viable under current law. *See Duncan,* 844 F.2d at 1268 n. 10 (holding that *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690–93, 98 S.Ct. 2018, 2035–37, 56 L.Ed.2d 611 (1978), eliminated respondeat superior liability for private corporations as well as municipalities); *De-Vargas,* 844 F.2d at 723 (same). Plaintiff's attempts to hold the hospital directly liable, are equally unavailing.

■ At best, the undisputed facts support only an inference that the hospital instructed Falkoff to proceed with the search in accordance with its general policy of obeying facially valid court orders. Because, as explained earlier, the body cavity search authorized by the warrant did not violate plaintiff's constitutional rights in this case, the hospital's approval of the search did not injure plaintiff in any legally cognizable way.

■ Alternatively, the hospital's policy can be analyzed under the principles set out for municipal policies in *City of Canton, supra.* In that case, the Supreme Court indicated that a municipality could be held liable for a failure to train its police officers only if its training policy, which in itself was not unconstitutional, demonstrated a deliberate indifference to the rights of the citizenry. Similarly, a private corporation should not be held liable for establishing a lawful and constitutional policy when it has no reason to believe that the policy will lead to the deprivation of someone's constitutional rights. The hospital's policy of complying with facially valid court orders, which it conveyed to Dr. Falkoff, cannot be considered deliberately indifferent to the rights of Taunton's inhabitants.[8]

### 5. The Pendent State Law Claims Must Be Dismissed

The state law claims implicate the same general questions of immunity and failure to state a claim discussed above. However, as summary judgment is required for defendants on all of plaintiff's federal claims, the appropriate course is to dismiss the state law claims without prejudice. *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). "In the absence of unusual circumstances, district courts should decline to recognize pendent jurisdiction in cases where all federal claims have been dismissed prior to trial." *Daley v. Town of Durham, NH,* 733 F.2d 4, 8 (1st Cir.1984); *see also Cullen v. Mattaliano,* 690 F.Supp. 93, 99 (D.Mass.1988). This is now such a case.

### IV. ORDER

For the foregoing reasons, it is hereby ORDERED that:

1) Defendants' motions for summary judgment on all of plaintiff's claims based upon federal law are ALLOWED; and

---

**8.** The hospital, of course, cannot be held directly responsible for the alleged unreasonable manner of execution of the search. The hospital did not instruct Dr. Falkoff on how the examination should be conducted nor did it supervise of participate in the examination in any way. In addition, because the hospital and its staff were not under contract with the City and had never before been requested to conduct a body cavity search, any failure to train Falkoff in proper search techniques, which I do not ??? believe plaintiff alleges, could not comprise deliberate indifference to the rights of Taunton's inhabitants.

2) Plaintiff's remaining state law claims are hereby DISMISSED without prejudice to being pursued in the courts of the Commonwealth of Massachusetts.