Shirley Mello RODRIQUES,
Plaintiff, Appellant,

v.

Joseph FURTADO, et al., Defendants,
Appellees.

No. 91–1262.

United States Court of Appeals,
First Circuit.

Heard July 31, 1991.

Decided Dec. 5, 1991.

Paul W. Patten, Fall River, Mass., for plaintiff, appellant.

Allen N. David with whom Chantal M. Healey and Peabody & Arnold, Boston, Mass., were on brief for Joseph Furtado, David Westcoat and City of Taunton.

Thomas M. Elcock with whom Peter C. Knight, David E. Maglio and Morrison, Mahoney & Miller, Boston, Mass., were on

brief for Phillip M. Falkoff, M.D. and Morton Hosp., Inc.

Before TORRUELLA, Circuit Judge, HILL,* and BOWNES, Senior Circuit Judges.

HILL, Senior Circuit Judge.

Appellant brought a § 1983 action seeking damages for deprivation of her Fourth Amendment right to be free from unreasonable searches resulting from a search of her vagina conducted pursuant to a warrant. The United States District Court for the District of Massachusetts granted the appellees' motions for summary judgment and this appeal was brought, 771 F.Supp. 1245.

We rule that (1) the search of appellant's vagina was not unreasonable by its very nature; (2) appellee Furtado is entitled to the defense of qualified immunity; (3) appellant has no actionable § 1983 claim against appellees Taunton Police Department and Westcoat; (4) appellee Falkoff, a

state actor in this instance, is entitled to the defense of qualified immunity; and (5) appellant has no actionable § 1983 claim against appellee Morton Hospital, Inc.

AFFIRMED

I. FACTUAL BACKGROUND

Search warrants for appellant's apartment and vagina were issued by an assistant clerk of the Taunton (Massachusetts) District Court to appellee Joseph Furtado, a thirteen year veteran of the Taunton Police Force and one of eight officers on the force authorized to apply for search warrants without first securing prior approval from a superior officer. Appellee David Westcoat is the chief of the Taunton Police Force.

The warrant was issued upon Furtado's three page Affidavit in Support of Application for Search Warrant, which contained various allegations that appellant was actively involved in the distribution of narcotics.[1] Upon securing the warrant, Furtado

---

* Of the Eleventh Circuit, sitting by designation.

1. According to the record, Furtado's three page affidavit upon which the warrant was issued specifically alleged: (1) That the police department had received numerous calls through Crime Stoppers alleging that appellant and her husband were selling narcotics out of their apartment; (2) That police officers had periodically observed "known drug users" entering appellant's apartment building and exiting a short time later; (3) That on one occasion, Todd Guzman, a known drug user, was observed swallowing something when approached by police officers after exiting appellant's building; (4) That on one occasion, Paul Guzman, a known drug user, was observed making at least ten trips into appellant's apartment building in one evening, each time leaving a second individual waiting across the street in his automobile; (5) That on one occasion, a police officer observed a fresh needle track mark on Paul Guzman's arm shortly after Guzman left appellant's building; (6) That on one occasion, John Sekell, a known drug user, was arrested shortly after leaving appellant's apartment building in possession of a glassine bag of marijuana; (7) That appellant was arrested on drug violations on March 1, 1977, and that appellant and her husband had been previously convicted for possession of narcotics; (8) That police officers had previously searched appellants' residence on four occasions, the most recent being June 14, 1986, seizing narcotics, drug paraphernalia and money on each occasion; (9) That appellant and her husband had been indicted on June 19, 1986,

following the June 14, 1986, search and were awaiting trial; (10) That on June 17, 1986, Furtado received a telephone call from an unknown party stating that police had not done well in their June 14, 1986 raid, that they had missed discovering appellant's husband's "works" which were hidden in the hallway near a window and that appellant kept dilaudids hidden in her vagina; (11) That following the June 14, 1986 raid, Furtado had contacted one of three confidential informants (the "CI") who had provided information leading to the search who stated that appellant and her husband were still dealing drugs, that they now required purchasers to take the drugs in their apartment and that appellant was hiding drugs in her vagina; (12) That on August 20, 1986, the CI contacted Furtado and stated that he had just left appellant's apartment, that appellant's husband had just arrived with a large supply of heroin, that there might be some cocaine in the apartment and that there was a strong possibility that appellant was hiding heroin in a prophylactic in her vagina; and (13) That the CI also stated on August 20, 1986 that he believed appellant was hiding narcotics in her vagina because on one occasion, the appellant had gone into the bathroom and returned with narcotics after the CI had paid for drugs, because he had heard unidentified others discussing appellant's practice of hiding drugs in her vagina, and because Paul Guzman, an alleged close associate of appellant, had told the CI "she was holding the stuff up her" while pointing to the groin area.

went to appellant's apartment where a search of the premises was conducted by police and the occupants were subjected to sniff searches by police canine units. Police discovered what appeared to be a block of heroin in the bedroom. Appellant was informed of the warrant to search her vaginal cavity, informed that the warrant directed that the search be conducted by a physician at the Morton Hospital, and was offered the opportunity to remove whatever might be hidden in her vagina voluntarily, thus alleviating the necessity of the search. Appellant declined this suggestion and was escorted to the Morton Hospital by a female police officer.

What exactly occurred at the Morton Hospital is disputed, but this much appears clear: Sometime after 3:00 A.M., appellant and the female officer arrived at the Morton Hospital emergency room, where the female officer presented the vaginal cavity search warrant to appellee Phillip Falkoff, M.D. Falkoff telephoned the hospital's acting president and Administrator-on-call for advice and was informed of the hospital's consent policy and its requirement to act and comply when presented with a court order. The hospital did not have any official policy regarding warrants to conduct body cavity searches.

Assisted by a nurse, Dr. Falkoff conducted a visual and manual inspection of appellant's vaginal cavity. Appellant claims she was subjected to threats of physical coercion and was held down on the examining table, Dr. Falkoff denies these allegations.[2] The search revealed an absence of foreign bodies in appellant's vaginal cavity.

On June 26th, 1987, appellant brought suit under 42 U.S.C. § 1983 in the district court against Furtado, Westcoat, the City of Taunton, Dr. Falkoff, and Morton Hospital, Inc., alleging that the affidavit for the body cavity search warrant was facially deficient and that the search conducted pursuant to the warrant was unreasonable both on its face and in its method of execution. Appellant also charged that the allegedly unconstitutional search was conducted pursuant to a custom or policy of the City of Taunton which demonstrated a reckless disregard for appellant's rights. Appellant has never alleged deliberate falsity or malice on the part of Furtado in drafting the warrant affidavit.

Appellees brought a motion in the district court requesting summary judgment on grounds of qualified immunity and failure to state a claim. The district court ruled that the search of appellant's vagina was not unconstitutional *per se* and that the search was conducted pursuant to a warrant which, given the totality of the circumstances evidenced in the warrant affidavit, indicated that there was a fair probability that narcotics would be found in appellant's vagina. The district court also ruled that, even if the warrant was not issued upon probable cause, (1) appellee Furtado was entitled to qualified immunity; (2) appellees Westcoat and the City of Taunton were not liable; (3) Dr. Falkoff, a state actor, was entitled to qualified immunity; and (4) Morton Hospital, Inc., was not liable. Based on these grounds, appellees' motions for summary judgments were granted. Appellant subsequently brought this appeal.

For the reasons given below, we AFFIRM the district court's granting of the appellees' motions for summary judgment.

## II. STANDARD OF REVIEW

We review the grant of summary judgment *de novo*, employing the same

2. Appellant claims she was told a State Trooper was outside the examining room and, despite her lack of consent, she was going to be searched "one way or another." Appellant claims she was pushed down on the examining table and held there by the nurse, while Dr. Falkoff inserted a probe inside her vagina and conducted a bimanual palpation of appellant's abdomen and vagina.

Dr. Falkoff denies these allegations and maintains that appellant refused to sign a consent form but did not object to the search. She was allowed to undress in private, don a sheet for privacy and place herself on the examining table. Apparently, appellant was also allowed to use the bathroom prior to the examination. Dr. Falkoff maintains he conducted a twenty second inspection of appellant's vagina using a spotlight and speculum, revealing an absence of foreign bodies.

standards utilized by the trial court. *See Siegal v. American Honda Motor Co.*, 921 F.2d 15, 17 (1st Cir.1990). Summary Judgement is appropriate only if there is no genuine dispute as to material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.Proc. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The court must review the record, together with all reasonable inferences therefrom, in the light most favorable to the non-moving party, here appellant. *See Johnson v. Educational Testing Service*, 754 F.2d 20, 25 (1st Cir.), *cert. denied*, 472 U.S. 1029, 105 S.Ct. 3504, 87 L.Ed.2d 635 (1985). What is material is determined by the substantive law. Only those facts in dispute that might affect the outcome of the suit under the governing law will bar the entry of summary judgment. Factual disputes which are irrelevant or unnecessary will not be considered. *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). To determine whether a dispute as to a material fact is genuine, the court must decide whether the "evidence is such that a reasonable [fact-finder] could return a verdict for the non-moving party." *Id.* The party opposing the motion carries the burden of providing the court with "some indication that he can produce the quantum of evidence to enable him to reach the jury with his claim." *Hahn v. Sargent*, 523 F.2d 461, 468 (1st Cir.1975). With these standards in mind, we will address each of appellant's claims in turn.

## III. APPELLANT'S CLAIMS

### A. *Claim Against Detective Furtado*

Appellant bases her claim against Furtado upon her right to be free from an unreasonable body cavity search conducted pursuant to a warrant issued on less than probable cause. Appellant's claim against Furtado necessarily turns on whether (1) appellant had a right to be free from manual body cavity searches under the circumstances of this case, and (2) whether a reasonable official in Furtado's position would have realized that the search violated appellant's rights, either because the search was unreasonable *per se* or the warrant affidavit was insufficient to establish probable cause to believe appellant was hiding drugs in her vagina.[3]

#### 1. Reasonableness of the Search

■ Appellant claims the search of her vagina as authorized by the warrant was unreasonable by its very nature. Appellant argues that the severity of the intrusion into her privacy and security interests far outweighed any rational governmental interest in conducting the search and that the search was, therefore, unreasonable within the meaning of the Fourth Amendment to the Constitution of the United States.

In *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the Supreme Court upheld the admissibility of evidence obtained through a warrantless, non-consensual blood test of an alleged drunk driver. In so doing, the Court noted:

---

3. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) ("Government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."); *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) ("The ... right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has been held unlaw-

ful, but that in the light of preexisting law the unlawfulness must have been apparent.")

In *Burns v. Loranger*, 907 F.2d 233, 235–36 (1st Cir.1990), the First Circuit interpreted Supreme Court rulings on the matter to forge a two part test for qualified immunity claims: First if the right asserted by the [Appellant] was "clearly established" at the time of its alleged violation, we are required to assume that the right was recognized by the [Appellee] official ...; second, we will deny the immunity claim if a reasonable official situated in the same circumstances should have understood that the challenged conduct violated that established right.

[W]e reach this judgment only on the facts of the present record. The integrity of an individual's person is a cherished value of our society. That we today hold that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions.

*Id.* at 772, 86 S.Ct. at 1836.

Nine years later, the Court refused to allow nonconsensual surgery to be performed on a criminal defendant in order to remove a bullet that would allegedly have been inculpatory. *See Winston v. Lee,* 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985). Compelled surgical intrusion into the body, wrote the Court, "implicates expectations of privacy and security of such magnitude that the intrusion may be 'unreasonable' even if it is likely to produce evidence of the crime." *Id.* at 759, 105 S.Ct. at 1616. Determining the reasonableness of the intrusion, the Court stated:

[D]epends on a case-by-case approach, in which the individual's interests in privacy and security are weighed against society's interests in conducting the procedure. In a given case, the question whether the community's need for evidence outweighs the substantial privacy interests at stake is a delicate one admitting of few categorical answers.

*Id.* at 760, 105 S.Ct. at 1616.[4]

The Supreme Court has upheld visual body cavity searches of inmates, *see Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), and proffered the appropriateness of visual and manual cavity searches of border entrants, provided the proper level of suspicion attaches. *See United States v. Montoya de Hernandez,* 473 U.S. 531, 541 n. 4, 105 S.Ct. 3304, 3310 n. 4, 87 L.Ed.2d 381 (1985) (declining to rule what level of suspicion is required for body cavity searches at the border).

The First Circuit has expressed its revulsion for body cavity searches not supported by probable cause. *See Blackburn v. Snow,* 771 F.2d 556, 564 (1st Cir.1985) ("Body cavity searches are 'demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission,'" representing "the greatest personal indignity." (citations omitted)); *Bonitz v. Fair,* 804 F.2d 164, 173 (1st Cir.1986) (body cavity searches of female inmates involving touching, conducted in a non-hygienic atmosphere and in the presence of male officers, ruled a clear violation of the inmate's fourth amendment right to be free from unreasonable searches).

We have not, however, heretofore examined the issue of whether a body cavity search conducted pursuant to a warrant issued upon probable cause violates the Fourth Amendment's prohibition of unreasonable searches. Other Circuits have visited the question, and upheld visual body cavity searches when supported by probable cause and conducted by police officers. *See Salinas v. Breier,* 695 F.2d 1073, 1085 (7th Cir.1982), *cert. denied,* 464 U.S. 835, 104 S.Ct. 119, 78 L.Ed.2d 118 (1983) (Fourth Amendment does not prohibit police officers "with probable cause to believe that a controlled substance is hidden in a person's rectum or vagina, without first obtaining a warrant and without obtaining the services of a doctor under sanitary conditions, to require the person, without the use of force, to bend forward deeply at the waist so as to expose her rectum and vagina to visual inspection."); *Security & Law Enforcement Employees, Dist. Council 82, et al v. Carey,* 737 F.2d 187, 208 (2nd Cir. 1984) (Visual body cavity searches of corrections officers may be conducted after first securing a search warrant based on probable cause).

The present case differs from these cases in that the search warrant here anticipated a physical rather than merely a visual inspection of appellant's vaginal cavity.

---

**4.** The Supreme Court ultimately refused to compel the surgery because of (1) the indeterminate, though slight, health risk to the defendant; (2) the extensive intrusion into the defendant's privacy, security, and bodily interests; and (3) the availability of ample other evidence of defendant's guilt. *See Winston,* 470 U.S. at 765–66, 105 S.Ct. at 1619–20.

Even though the warrant did not specify whether the search was to be limited to visual inspection or extend to physical examination, the requirement that the search be conducted by a physician at Morton Hospital anticipates a manual or physical probe.

"The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." *Schmerber*, 384 U.S. at 767, 86 S.Ct. at 1834. Because the Fourth Amendment only prohibits unreasonable searches, *see Carroll v. United States*, 267 U.S. 132, 147, 45 S.Ct. 280, 283, 69 L.Ed. 543 (1925), the pivotal inquiry is whether this particular physical search of appellant's vagina was reasonable. The test for reasonableness is not subject to precise definition or mechanical application. Each individual case requires a balancing of the need for the particular search against the invasion of personal rights the search imposes. Reviewing courts must "consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish*, 441 U.S. at 559, 99 S.Ct. at 1884; *see, e.g., United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977).[5]

The invasion here was extreme, constituting a drastic and total intrusion of the personal privacy and security values shielded by the fourth amendment from unreasonable searches. Searches of this nature instinctively give us cause for concern as they implicate and threaten the highest degree of dignity that we are entrusted to protect.

On the other side of the balance, the need for the search was also great. Society's interest in the prevention and punishment of drug trafficking weighs in favor of intrusive searches in certain instances. In the present case, other, less intrusive means of investigation and prosecution may have been available. However, given the circumstances as a whole, the existence of other means of investigation and prosecution in this case does not render the vaginal search unreasonable. The need for this particular search may have been necessary to enable the police to discover whether appellant was trafficking in drugs which she kept hidden in her vagina, as specifically alleged in the affidavit for the warrant.

The warrant directed that the search be conducted by a physician at Morton Hospital. For hygienic and safety reasons, these precautions seem necessary when warrants authorizing manual body cavity searches are executed. At least where there are no exigent circumstances present, the severity of the personal intrusion manifested by these searches would indicate that they be conducted by a doctor in a private and hygienic setting and in a medically approved manner. *See Schmerber*, 384 U.S. at 771–72, 86 S.Ct. at 1836.

In consideration of the balancing factors enunciated in the *Schmerber/Winston/Bell* line of cases, we conclude that appellant did not have a clearly established constitutional right to be free from a manual body cavity search conducted by a licensed physician, in a private and hygienic setting and medically approved manner, pursuant to a warrant issued on probable cause. The search was not unreasonable by its very nature within the meaning of the Fourth Amendment to the Constitution of the United States.

### 2. Qualified Immunity

■ We turn next to appellee Furtado's defense of qualified immunity. In assessing the Supreme Court's rulings regarding qualified immunity in *Harlow* and *Anderson, see* note 3 *supra*, this court has established the applicable standard of qualified immunity for police officers conducting arrests pursuant to warrants. Officers performing arrests pursuant to warrants are not absolutely immunized by virtue of an intervening Magistrate's approval, but are entitled to a broad ranging qualified immunity:

Nonetheless, these four criteria are relevant considerations in determining the reasonableness of the search at issue.

5. We note that *Bell* was a case involving the visual body cavity search of inmates and thus not dispositive under the present circumstances.

Applying the standard of official immunity enunciated in *Harlow* [*see* note 3 *supra*], we hold that *only* where an officer is "constitutionally negligent," that is, where the officer should have known that the facts recited in the affidavit did not constitute probable cause, will liability attach. Where the sufficiency of the facts fall into the grey area appropriate for judicial determination, submission of the affidavit to a magistrate will insulate the officer from liability.

*Briggs v. Malley*, 748 F.2d 715, 721 (1st Cir.1984) (emphasis in original).

In affirming our holding, the Supreme Court said:

The *Harlow* standard is specifically designed to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment," and we believe it sufficiently serves this goal. Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized ... Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost.

*Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).[6]

■ Under this analysis, it is not necessary for us to decide whether Furtado's warrant affidavit established probable cause.[7] Even if probable cause for the search of appellant's vagina were not established, *and we do not so rule here*, the application was not "so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *See* note 1, *supra*. Nor is it "obvious that no reasonably competent officer would have concluded that a warrant should issue." At the very least, "officers of reasonable competence could disagree on this issue," and the facts in the affidavit "fall into the grey area appropriate for judicial determination."[8] A reasonable police officer could have concluded that there was probable cause to search appellant's vagina for concealed drugs. Accordingly, we rule that appellee Furtado was entitled to the defense of qualified immunity and AFFIRM the district court's granting of summary judgment as to him.[9]

6. While *Malley* dealt with the immunity standard for submission of affidavits in application for arrests warrants, the Supreme Court stated the same standard applied in application for search warrants. *Malley*, 475 U.S. at 344 n. 6, 106 S.Ct. at 1097 n. 6.

7. Nonetheless, probable cause is a "practical, non-technical conception" and its existence is determined from "a totality of circumstances" known to the investigating officer. *Illinois v. Gates*, 462 U.S. 213, 230–31, 103 S.Ct. 2317, 2328–29, 76 L.Ed.2d 527 (1983). Probable cause to search exists if "given all the circumstances, there [was] a fair probability that contraband or evidence [would] be found." *United States v. White*, 766 F.2d 22, 25 (1st Cir.1985). Without ruling on the matter, it seems reasonable to believe that probable cause existed in this situation.

8. Appellant does not claim deliberate falsity or malice on the part of Furtado in drafting and submitting the warrant affidavit. It is true that the fact that the search was conducted pursuant to a warrant does not alone shield Furtado from liability under § 1983 for an unreasonable search. However, "searches conducted pursuant to a warrant will rarely require any deep inquiry into reasonableness ... for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *United States v. Leon*, 468 U.S. 897, 922, 104 S.Ct. 3405, 3420, 82 L.Ed.2d 677 (1984) (citation omitted); *see Illinois v. Gates*, 462 U.S. at 267, 103 S.Ct. at 2347–48.

9. Appellant attacks the warrant affidavit on several grounds which we will examine here:

(1) The averments lack important details which the issuing magistrate should wish to know, among them: (a) the number of and dates of calls to Crime Stoppers and identity of the parties calling; (b) the dates the known drug users were seen entering the appellant's apartment building; (c) the reliability and basis of the anonymous tipster who called Furtado and allegedly told him about appellant's practice of hiding drugs in her vagina; (d) the credibility that should be accorded the CI's allegations, given that the CI is heroin user; and (e) unreasonable inferences drawn from the CI's statements, some of which was unsubstantiated hearsay, that appellant may have been hiding drugs in her vagina.

These challenges are by no means frivolous. Any one of the averments standing alone might

## B. Claims Against Chief Westcoat and the City of Taunton

■ Appellant argues that Chief Westcoat and the City of Taunton are liable under § 1983 because the decision of Detective Furtado to seek and execute the warrant authorizing the search of appellant's vagina constituted a municipal policy that sanctioned a violation of appellant's Fourth Amendment rights. Appellant also claims that the City, through Chief Westcoat, failed to adequately supervise or train Detective Furtado in the obtaining of search warrants. For the reasons given below, Chief Westcoat and the City of Taunton are entitled to summary judgment as a matter of undisputed fact and law.

The search of appellant's vagina was not unreasonable. Further, the conduct of Detective Furtado was objectively reasonable. Thus, there is no causal connection between any deficient city policy manifested by the search and an alleged deprivation of appellant's Fourth Amendment rights. *See Burns*, 907 F.2d at 239.

■ Irrespective of whether Furtado acted reasonably, his actions alone are insufficient to establish a municipal policy. *See St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1987). Furtado's authority to seek search warrants on his own initiative without prior approval of a superior officer is not the equivalent of policy making authority.

Regarding appellant's claim that the City failed to adequately train or supervise Furtado, "Only where a municipality's failure to train its [police officers] in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be thought of as a city 'policy or custom' that is actionable under § 1983." *Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989). This same standard applies where the claim is a failure to adequately supervise. *See Bordanaro v. McLeod*, 871 F.2d 1151, 1158 (1st Cir.1989). Appellant offers no evidence of a policy indicative of a deliberate indifference to the rights of Taunton's citizenry, nor do we find any evidence of such reflected in the record.

■ Appellant's only predicate for her claim is the fact that the Taunton police force had *no official training or supervisory policies regarding body cavity searches* beyond those policies governing searches in general. However, an arguable "weakness in police training [or supervision does] not amount to a 'policy of failure to train arising from deliberate indifference to citizens' constitutional rights.'" *Burns v. Loranger*, 907 F.2d 233, 239 (1st Cir.1990) (quoting *Santiago v. Fenton*, 891 F.2d 373, 381–82 (1st Cir. 1989)).

Because there was no actionable § 1983 claim against Westcoat or the City of Taunton, we AFFIRM the granting of summary judgment as to them.

## C. Claim Against Dr. Falkoff

In order to state a claim under § 1983, appellant must show that the alleged deprivation of her constitutional rights was committed by a person acting under color of state law. 42 U.S.C. § 1983. State action may be found in the exercise by a private individual of powers "traditionally exclusively reserved to the State." *Jackson v. Metropolitan Edison, Co.*, 419 U.S. 345, 352, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1974). Whether Dr. Falkoff acted under color of state law in executing the search warrant depends upon whether there is "a sufficiently close nexus between the State

well be an insufficient basis to find probable cause. Probable cause, however, is determined by a totality of the circumstances which demonstrate a fair probability that contraband or evidence will be found. *See Illinois v. Gates*, 462. U.S. at 230–31, 103 S.Ct. at 2328; *United States v. White*, 766 F.2d at 25; note 8, *supra*. It is reasonable to conclude that the totality of the circumstances of Furtado's affidavit created a fair probability that drugs would be found in appellant's vagina. The anonymous tip tended to corroborate the CI's report. The CI in turn, had previously provided reliable information. If the CI's use of drugs disqualified him from serving as a reliable informant, many such informants nationwide would be ineligible to assist drug enforcement officers. Hearsay is a permissible basis for a finding of probable cause. *See* Fed.R.Crim.Proc. 41(c)(1).

and the challenged action [of Dr. Falkoff] so that the action of the latter may fairly be treated as that of the State itself." *Id.* at 351, 95 S.Ct. at 453; *see West v. Atkins,* 487 U.S. 42, 56, 108 S.Ct. 2250, 2259, 101 L.Ed.2d 40 (1988) (In determining whether action taken by a private individual is under color of state law, "The dispositive issue concerns the relationship between the State, the physician and [appellant].")

■ Dr. Falkoff functioned as a state actor when performing the vaginal search of appellant. The scope and motivation for the search were established solely by the state's investigatory goals and justified solely by the search warrant. Dr. Falkoff's role in the search was purely that of an auxiliary to normal police search procedures. He exercised the power of search traditionally reserved exclusively to the State, *see Jackson,* 419 U.S. at 352, 95 S.Ct. at 454, because of the "coercive power" and "significant encouragement" represented by the search warrant. *See, e.g., Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982) ("State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed that of the State.")

■ The issue remains, however, whether Dr. Falkoff is entitled to qualified immunity, both as a matter of law and under the specific facts of this case.

Whether qualified immunity exists for private individuals acting under color of state law has never been decided by the Supreme Court. The Court has intimated that qualified immunity may be appropriate for private individuals in certain instances. *See Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 942 n. 23, 102 S.Ct. 2744, 2756 n. 23, 73 L.Ed.2d 482 (1982).[10] Several Appellate Courts have ruled that the qualified immunity defense exists for private individuals in suits premised on the private individual's use of unconstitutional attachment statutes. *See Jones v. Preuit & Mauldin,* 851 F.2d 1321 (11th Cir.1988) (en banc), *vacated on other grounds,* 489 U.S. 1002, 109 S.Ct. 1105, 103 L.Ed.2d 170 (1989); *Buller v. Buechler,* 706 F.2d 844 (8th Cir.1983); *Folsom Investment Co. v. Moore,* 681 F.2d 1032 (5th Cir.1982).[11]

One Circuit Court has concluded that private individuals are not entitled to qualified immunity in § 1983 actions, and the reasoning behind that opinion gives us insight as to why Dr. Falkoff *should* be afforded the qualified immunity defense in this case. In *Duncan v. Peck,* 844 F.2d 1261 (6th Cir. 1988), the Sixth Circuit stated that private individuals threatened with monetary liability under § 1983 are not entitled to qualified immunity. The opinion was based on the court's reasoning that private individuals "do not face the dilemma of being required by law to use their discretion in a

10. Responding to a dissenting opinion, the majority wrote:

> [The dissenting opinion] is concerned that private individuals who innocently make use of seemingly valid state laws would be responsible, if the law is subsequently held to be unconstitutional, for the consequences of their actions. In our view, however, this problem should be dealt with not by changing the character of the cause of action but *by establishing an affirmative defense. A similar concern is at least partially responsible for the availability of a good-faith defense, or qualified immunity, to state officials. We need not reach the question of the availability of such a defense to private individuals at this juncture.*

*Lugar,* 457 U.S. at 942 n. 23, 102 S.Ct. at 2756 n. 23 (emphasis supplied).

11. The First Circuit concluded that a private individual could not assert a defense of qualified immunity in *Downs v. Sawtelle,* 574 F.2d 1 (1st Cir.1978), a case which Appellant relies upon here. *Downs,* however, pre-dated *Lugar,* in which the Supreme Court at least suggested that qualified immunity is available to private individuals in certain situations, *see* note 10, *supra,* and *Harlow,* in which the Supreme Court expanded qualified immunity to nearly all public employees, *see* note 3, *supra.*

Furthermore, the *Downs* opinion was at least in part based upon the reasoning that, "Private parties simply are not confronted with the pressures of office, the often split-second decision making or the constant threat of liability facing police officers, governors, and other public officials." *Downs,* 574 F.2d at 15–16. For reasons expanded upon in the remainder of this section of our opinion, we find this reasoning in *Downs* unpersuasive in the present case.

way that might unfairly expose them to lawsuits," nor is a private individual's discretion undesirable chilled "because a private party is governed only by self-interest and is not invested with the responsibility of executing the duties of a public official in the public interest." *Duncan*, 844 F.2d at 1264.

*Duncan* and *Sawtelle* are both situations where a private actor initiated action and then sought to employ a state apparatus to carry out that action. The present situation is quite different. Here, state officials were the initiating parties and they pressed a private citizen into assisting their efforts.

Dr. Falkoff is entitled to the defense of qualified immunity in this situation. His liability is asserted upon the fact that he operated as a state actor in conducting a search procedure traditionally within the power of the State. Yet Dr. Falkoff did not act on his own initiative, he was pressed into service by the State. He was uniquely qualified to carry out this search in a safe and hygienic manner. Where a private physician agrees to assist police in search procedures which police cannot reasonably, hygienically or safely perform, the physician is entitled to no less protection than the police would be if they could reasonably perform the search. Nor is there any allegation that Dr. Falkoff was acting out of self interest in conducting the search.

Furthermore, public policy is well served by extending Dr. Falkoff qualified immunity in this case. A physician presented with a warrant authorizing a body cavity search is not in a situation analogous to a private party utilizing an unconstitutional statute for selfish means. *See Duncan*, 844 F.2d at 1264. Rather, the physician is "invested with [and has accepted] the responsibilities of a public official in the public interest." *Id.* Extending qualified immunity to physicians under the circumstances of this case not only benefits society by effectuating acceptable means to execute body cavity searches pursuant to a warrant issued on probable cause, it also benefits the party

being searched by providing a safe means of conducting the search in a medically approved manner. Under the circumstances of this case, exposing private physicians to § 1983 liability without the shield of qualified immunity would be not only be unfair, it could deter them from assisting in the execution of valid warrants. A reluctance on the part of physicians to perform body cavity searches could well signal a loss to society of a valuable crime detection procedure or result in these procedures having to be carried out by nonprofessionals, a situation which would be even more intrusive of the subject's privacy.

 We must next decide what criteria determines whether a physician in these circumstances is entitled to the defense of qualified immunity. That the warrant was facially valid and reasonable entitles Dr. Falkoff to the defense of qualified immunity. We will not require a private physician to look behind an objectively reasonable and facially valid warrant to determine whether it is based upon probable cause. There is no duty imposed upon the physician to make inquiry of the officer regarding his basis for probable cause where the warrant is objectively facially valid. *See, e.g., United States v. Velasquez*, 469 F.2d 264, 266 (9th Cir.1972), *cert. denied*, 410 U.S. 945, 93 S.Ct. 1399, 35 L.Ed.2d 612 (1973) ("Since the physician is required to have no knowledge of the law of search and seizure to practice his profession, any such enumeration of the facts to the doctor would be a meaningless ritual ... comparable to requiring the police to recite to a locksmith the basis for their probable cause before he could legally open a lock for them. We cannot see how such a recitation would serve to strengthen the guarantees of the Fourth Amendment.") It is a necessary though substantial imposition upon the physician to require him or her to learn the constitutional requirements of invasive body searches. We will not add to that imposition by requiring them to examine the boundaries of probable cause.[12]

12. We caution however, that the mere fact that a warrant authorizing a body cavity search has been issued will not alone immunize an examining physician from potential liability where

A reasonable physician operating in the same circumstances as Dr. Falkoff could have believed the warrant was facially valid. Based on this conclusion, and no more, Dr. Falkoff is immunized from liability for the mere fact of performing the search under the qualified immunity standard.[13] Accordingly, we AFFIRM the granting of summary judgment as to him.

### D. *Claim Against Morton Hospital, Inc.*

Appellant claims Morton Hospital, Inc., caused her injury by authorizing Dr. Falkoff to violate her Fourth Amendment rights. For reasons stated below, the hospital is entitled to summary judgment.

First, the facts support only an inference that the hospital administrator, by referring Dr. Falkoff to the hospital's general policy of obeying facially valid court orders, authorized or instructed the Doctor to perform the search. Second, because the body cavity search did not violate appellant's constitutional rights, the hospital's tacit approval has no causal connection to any alleged deprivation of appellant's Fourth Amendment rights.

Finally, because the hospital's policy of honoring facially valid court orders did not amount to deliberate indifference to the rights of the citizenry, the hospital had no custom or policy that made it liable under § 1983. *See Canton v. Harris,* 489 U.S. at 389, 109 S.Ct. at 1205. Accordingly, summary judgment as to the hospital is AFFIRMED.

---

the search itself is such that a reasonable physician operating in similar circumstances would conclude the warrant was facially deficient. *See Winston,* 470 U.S. at 753, 105 S.Ct. at 1611.

13. There remain appellant's allegations regarding the manner in which the search was conducted. *See* note 2, *supra.* Viewing the record, as we must, in the light most favorable to the appellant, and assuming, without deciding, that they are true, we rule Dr. Falkoff is entitled to qualified immunity for the manner in which the search was conducted.

Regarding appellant's allegation that Dr. Falkoff threatened force in executing the search, appellant offers no evidence that an acceptable

### IV. JUDGMENT

The district court's granting of summary judgments to the appellees Furtado, Westcoat, City of Taunton, Falkoff, and Morton Hospital, Inc., are AFFIRMED.

---

amount of restraining force may not be applied in the execution of a body cavity search in the same manner as a more standard search. There may be a line of demarcation where personal dignity interests mandate that force may not be used in executing a search of this nature. However, the mere *threat* of force in this instance does not cross that line.

Regarding the bimanual palpation of appellant's vagina and abdomen, its purpose was not explained. Yet appellant does not aver that the procedure was performed for an improper purpose. Nor does appellant aver that the procedure was more painful or invasive than that part of the search we have ruled reasonable.