McKEIG, Justice (dissenting).
This case involves a body cavity search for evidence when the police had a search warrant. Appellant Guntallwon Brown hid evidence of a crime in his rectum after he was arrested on suspicion of a controlled-substance crime. The police saw a plastic baggie sticking out of Brown's anus, but Brown refused to remove it. The police then obtained a search warrant authorizing medical procedures for the removal of the baggie. At a hospital, Brown refused alternatives for removal that required his cooperation. A doctor then sedated Brown and removed the baggie during an anoscopy. The baggie contained crack cocaine. Applying the three-part balancing test from Winston v. Lee , 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), I conclude that the search was reasonable and did not violate either the United States or Minnesota Constitution. As a result, I respectfully dissent.
I.
The facts regarding the search in this case are not disputed. In the summer of 2015, Minneapolis Police Officer Bryce Robinson arranged for a confidential informant to set up a controlled buy from Brown. After observing the transaction and seeing Brown engage in another hand-to-hand transaction consistent with selling drugs, a different police officer arrested Brown. During the arrest, Brown shoved his hands down his pants, possibly concealing something. Later, at the police station, *297 officers saw Brown grinding his buttocks in a back-and-forth motion against the seat of a chair, grinding his butt cheeks into the chair rail, and shoving his hands upwards between his legs.
Robinson had worked on many cases where suspects hide narcotics and contraband down their pants, and Brown's behavior lead Robinson to believe that Brown was trying to "jam narcotics up his rectum." With the approval of his supervisor and pursuant to department policy, Robinson conducted a strip search of Brown. Before conducting the search, Robinson gave Brown the option to manually remove whatever he was hiding so the officers did not need to perform the strip search, but Brown did not comply. Eventually, Robinson looked between Brown's butt cheeks and saw a portion of a plastic baggie sticking out of Brown's anus.
Robinson obtained a search warrant that authorized the search of Brown's body for narcotics. Robinson took Brown to North Memorial Hospital to remove the baggie. Before seeing a doctor, Brown was given the opportunity to manually remove the baggie, which he refused. Officers then presented the warrant to an emergency-room doctor. This doctor also told Brown he could manually remove the baggie, and once again Brown refused. The doctor also offered Brown a laxative, which Brown refused. This doctor would not perform any interventions beyond the external search because he did not believe that the warrant supported that type of procedure.
The police then went back to the district court and obtained a more specific warrant. The second warrant authorized a search of Brown and directed hospital staff to "use any medical/physical means necessary to have Brown vomit or deficate [sic] the contents of his stomach or physically by any means necessary remove the narcotics from the anal cavity so [o]fficers can retrieve the narcotics."
Robinson took Brown to Hennepin County Medical Center, showed both warrants to him, and again asked Brown to remove the baggie himself. Brown refused. Robinson then presented the warrant to an emergency-medicine doctor. The doctor gave four options to Brown: (1) Brown could remove the baggie himself; (2) the doctor could administer an enema, which would give Brown the urge to defecate; (3) the doctor could perform an anoscopy with Brown under sedation; or (4) the doctor could sedate Brown, place him on a ventilator, and intubate him with a nasogastric tube through which a laxative could be pumped into Brown's stomach and clear his bowels. The doctor told Brown that the first two options were preferable, but both required cooperation from Brown. Brown did not reply.
After explaining the four options a number of times to Brown, the doctor told Brown that he was going to leave the room and begin preparations for the sedation and anoscopy. When Brown further refused to speak, even after being given additional time to consider his options, the doctor had Brown sedated and performed the anoscopy. While sedation was not necessary to perform the anoscopy, the doctor felt it should be used to make the procedure more comfortable. Given that Brown refused to cooperate, the doctor believed that anoscopy was the safest option.
After placing a speculum into Brown's rectum, the doctor saw a plastic baggie. He removed the baggie with a forceps and turned the baggie over to Robinson, who had remained in the room to ensure Brown's and the doctor's safety and to ensure a chain of custody for the drugs. Hospital records indicate that the entire procedure took less than 20 minutes, and that at the end, Brown had returned to the *298 state he was in before the sedation began. Approximately an hour after the procedure began, Brown was discharged to the care of the police.
Law enforcement analyzed the contents of the baggie. It contained 2.9 grams of crack cocaine.
II.
One legal issue presented in this case is whether the search of Brown's body violated the Fourth Amendment of the United States Constitution. The Fourth Amendment does not forbid all searches within a person. Winston , 470 U.S. at 760, 105 S.Ct. 1611. Instead, the Fourth Amendment's "proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." Id. (citation omitted) (internal quotation marks omitted).
In Winston , the Supreme Court considered whether a state may, consistent with the Fourth Amendment, compel a suspect who police believed was shot during an attempted armed robbery to undergo surgery to search for evidence of the crime.[1] Id. at 756-58, 105 S.Ct. 1611. The Court held that "[t]he reasonableness of surgical intrusions beneath the skin depends on a case-by-case approach, in which the individual's interests in privacy and security are weighed against society's interests in conducting the procedure." Id. at 760, 105 S.Ct. 1611. It affirmed that "the threshold requirements for conducting" such a surgical search were "the ordinary requirements of the Fourth Amendment." Id. at 760-61, 105 S.Ct. 1611 (explaining the importance of probable cause and that a search warrant would ordinarily be required). In addition, the Court adopted a three-factor balancing test that was based on its decision in Schmerber v. California , 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). See Winston , 470 U.S. at 760-62, 105 S.Ct. 1611. This test considers: (1) "the extent to which the procedure may threaten the safety or health of the individual," (2) "the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity," and (3) "the community's interest in fairly and accurately determining guilt or innocence." Id.
Applying this three-factor test, the Court held that nonconsensual chest surgery, performed under general anesthesia, to remove a bullet lodged in the chest muscle of respondent was unreasonable and would violate the Fourth Amendment. Id. at 766-67, 105 S.Ct. 1611. The seriousness of chest surgery, coupled with the "uncertainty" about the medical risks the surgery would pose, led the Court to "militate[ ]" against finding the surgery reasonable. Id. at 764, 766, 105 S.Ct. 1611. With respect to the second factor, the Court agreed that the surgery "would be an extensive intrusion on respondent's personal privacy and bodily integrity" because the Commonwealth was "propos[ing] to take control of respondent's body [in order] to drug this citizen-not yet convicted of a criminal offense-with narcotics and barbiturates into a state of unconsciousness." Id. at 764-65, 105 S.Ct. 1611 (citation omitted) (internal quotation marks omitted). Finally, the Court concluded that the government's identified need for the bullet-to help identify respondent as the robber *299 who was shot by the victim during the attempted armed robbery-was "hardly persuasive" because "[t]he Commonwealth has available substantial additional evidence that respondent was the individual who accosted [the victim] on the night of the robbery." Id. at 765, 105 S.Ct. 1611.
I agree with the court that we should use the Winston test to determine whether the search of Brown's body was unreasonable, in violation of the Fourth Amendment. It is in the application of this test that I part ways with the court. After considering all the Winston factors, the search in this case was reasonable and did not violate the Fourth Amendment.
III.
A.
The first Winston factor is "the extent to which the procedure may threaten the safety or health of the individual." 470 U.S. at 761, 105 S.Ct. 1611. The medical evidence with respect to this factor is undisputed. An anoscopy is a common, uncomplicated medical procedure that involves looking inside a natural opening of the body. It takes only a few minutes to perform. While the procedure is uncomfortable, there is no evidence that it is painful. Brown was briefly sedated during the procedure, but this was done for his comfort. Although there are minor risks, such as bleeding and tearing, they are very unlikely. The most common complications almost always occur after the procedure, and Brown did not show signs of any of them. Unlike Winston , which involved proposed surgery under general anesthesia where there was a "sharp" disagreement between medical professionals about the possible risks, see id. at 763-64, 105 S.Ct. 1611, the first factor leans toward reasonableness.
B.
The second factor is "the extent of intrusion upon the individual's dignitary interests." Id. at 761, 105 S.Ct. 1611. I agree with the court that this was a substantial intrusion of Brown's privacy. The anoscopy involved searching a part of the body that is considered very private. Brown was also given drugs to sedate him against his will.
However, when evaluating this factor, I would also consider that the extent of the intrusion would have been less if Brown had cooperated.[2] See id. at 764 n.9, 105 S.Ct. 1611 (discussing the second factor and stating that "[s]omewhat different issues would be raised if the use of a general anesthetic became necessary because of the patient's refusal to cooperate"). Both the police and the doctors repeatedly told Brown that the baggie could be manually removed. Both doctors offered other alternatives, such as drinking a laxative, or an enema. All these options required cooperation from Brown, but he did not cooperate. Given all relevant circumstances, the intrusion of Brown's privacy is mitigated by his refusal to cooperate.
Finally, I believe that the court's reliance on Rochin v. California , 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), when discussing this factor is misplaced. In Rochin , the Supreme Court held that a defendant's due process rights were violated by police conduct that "shocks the conscious." Id. at 172, 72 S.Ct. 205. The Supreme Court considered all of the following *300 police conduct when making this determination: The police illegally broke into Rochin's house, and after seeing him swallow some pills, three officers physically attacked him, took him to a hospital, and directed a doctor to force a solution that induced vomiting through a tube into Rochin's stomach. Id. at 166, 172, 72 S.Ct. 205. Contrary to the court's claim, the Supreme Court did not conclude in Rochin that the medical procedure, in and of itself, shocked the conscious, see 342 U.S. at 172, 72 S.Ct. 205.
The facts of Rochin are clearly distinguishable from this case for several reasons. The police here did not illegally break into Brown's home and physically assault him. Unlike the police in Rochin , the police obtained a warrant before conducting the search of Brown's person, something even the court commends the police for doing. The defendant in Rochin did not refuse alternative searches to obtain the evidence that required his cooperation. And as the Supreme Court later made clear in Winston , forced medical procedures conducted pursuant to a warrant may comply with the Fourth Amendment. See 470 U.S. at 760, 105 S.Ct. 1611. The police conduct in this case does not shock the conscious.
C.
The third Winston factor is "the community's interest in fairly and accurately determining guilt or innocence." 470 U.S. at 762, 105 S.Ct. 1611. The community clearly has a strong interest in enforcing its drug laws. " '[A] clear indication that in fact [desired] evidence [would] be found' " as a result of the search weighs heavily toward a finding of reasonableness. Id. at 762, 105 S.Ct. 1611 (alterations in original) (quoting Schmerber , 384 U.S. at 770, 86 S.Ct. 1826 ). Here, police saw Brown participate in a controlled drug buy. When arrested and at the police station, he behaved in ways that strongly suggested he had hidden drugs in his rectum. And the police confirmed this suspicion when they saw a plastic baggie protruding from Brown's anus. There was a clear indication that illegal drugs would be found as a result of the search.
Moreover, unlike in Winston , where police had ample alternative evidence available to convict the suspect of attempted robbery, see 470 U.S. at 765-66, 105 S.Ct. 1611, the best evidence that Brown illegally possessed a controlled substance is finding a controlled substance on his person. In fact, it is virtually impossible for the police to prove a controlled-substance crime without recovering a controlled substance. The intrusion into Brown's body was necessary to charge and prove the drug-possession crime. The search was of vital importance to enforcing the law, just as the blood draw was necessary to enforce the drunk-driving law in Schmerber . See Winston , 470 U.S. at 763, 105 S.Ct. 1611. This factor weighs in favor of reasonableness.
D.
After considering the Winston factors, I conclude that the anoscopy performed on Brown pursuant to the warrant was reasonable. Weighing in favor of the search is the fact that the anoscopy posed little risk to Brown and that the search was of vital importance to enforce Minnesota's drug laws, given the critical nature of the evidence to the prosecution. While Brown suffered real dignitary harm, that harm is mitigated by Brown's refusal to cooperate with the manual removal of the baggie or other alternatives. In the end, after balancing all these factors, the search was reasonable. See Rodriques v. Furtado , 950 F.2d 805, 811 (1st Cir. 1991) (applying the Winston factors and concluding that a visual *301 and manual search of the plaintiff's vaginal cavity was not unreasonable).
IV.
Applying the Winston factors, the court concludes that the search here was unreasonable. But the court's application of the Winston factors is inconsistent with Winston , and other Supreme Court Fourth Amendment jurisprudence. In addition, the court's reasons for finding the search unreasonable are flawed.
When it applies the Winston factors, the court essentially disregards the first factor. It states that the first factor "has little bearing on our analysis." But the Supreme Court in Winston stated that this factor is of "crucial importance." 470 U.S. at 761 n.4, 105 S.Ct. 1611. Because it is undisputed that there are minimal health risks to an anoscopy and there is no evidence that Brown experienced any of these risks when the procedure was performed, this "crucial" factor weighs in favor of finding the search reasonable.
The court also relies heavily on the fact that there is a "practical" and "far less intrusive option to recover the baggie" because the police could have waited for the baggie to pass through natural elimination. This, however, is an expansion of Winston . The Court in Winston focused only on the importance of the evidence sought through the search, not on whether the State had alternative ways to obtain that evidence. See 470 U.S. at 765-66, 105 S.Ct. 1611. Moreover, the Supreme Court has "repeatedly refused to declare that only the 'least intrusive' search practicable can be reasonable under the Fourth Amendment." Vernonia Sch. Dist. 47J v. Acton , 515 U.S. 646, 663, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (quoting Skinner v. Ry. Labor Execs.' Ass'n , 489 U.S. 602, 629 n.9, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) ); see also Illinois v. Lafayette , 462 U.S. 640, 647, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983) ("The reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative 'less intrusive' means.").[3] Here, the court does exactly that: It concludes that the search is unreasonable largely because the police could have obtained the baggie through the "far less intrusive" option of the body's natural elimination process. See Rodriques , 950 F.2d at 811 (applying the Winston factors and concluding that "given the circumstances as a whole," the fact that "other, less intrusive means of investigation" were available did "not render the vaginal search unreasonable").
In addition, the court's conclusion that recovering the baggie through the body's natural elimination process is a "practical" and "far less intrusive" option is highly suspect. In order to retrieve the baggie in this manner, the police would be required to keep Brown under constant surveillance for hours or days in a location without access to a flushing toilet. It is unclear what the alternative bathroom arrangement would be.[4] They would need to do *302 this (1) to ensure Brown did not suffer medical complications from keeping narcotics in his rectum, and (2) to ensure that Brown was not able to flush the baggie down the toilet. Police surveillance would need to be the most intense when Brown went to the bathroom. Even with a non-flushing toilet, if the police were not immediately on hand, Brown could still reinsert the baggie into his rectum or swallow it after naturally eliminating it. Essentially, the police would need to stand next to Brown and closely watch him while he had a bowel movement in order to ensure Brown did not dispose of the baggie a second time. Retrieving the baggie through close police observation while Brown eliminated his bodily waste would involve a significant invasion of Brown's privacy. See Skinner , 489 U.S. at 617, 109 S.Ct. 1402 ("There are few activities in our society more personal or private than the passing of urine." (citation omitted) (internal quotation marks omitted)). This type of constant surveillance would also require significant police resources. This option is not "practical" nor is it "far less intrusive" than the anoscopy.
V.
Brown argues that because the respondent in Winston was afforded an evidentiary hearing when contesting the motion to compel his surgery, he is also entitled to such a hearing. There is no merit to this claim. The Supreme Court in Winston did not state-or even suggest-that any such procedure was necessary in addition to the warrant process to establish the threshold question of probable cause. See 470 U.S. at 760-63, 105 S.Ct. 1611. Brown has no other case support for his argument. I would not conclude that an evidentiary hearing is required.
VI.
Finally, Brown has argued that the search violated his right against unreasonable searches under the Minnesota Constitution. See Minn. Const. art. I, § 10. While Brown stated that "[t]he Minnesota Constitution provides protections against unreasonable searches and seizures greater than those provided by the Fourth Amendment," he argued that we should find the search unreasonable under the Winston factors and never argued that we should apply a different test or rule of law under the Minnesota Constitution. As a result, I question whether Brown has properly raised the issue of whether the Minnesota Constitution should be interpreted more broadly than the United States Constitution when determining whether a search within a person's body is unreasonable. See State v. Sorenson , 441 N.W.2d 455, 457 (Minn. 1989) ("We decline to apply the Minnesota Constitution in this case because the question of its applicability was neither adequately briefed nor litigated.").
But even if Brown had adequately raised and argued the issue, we have recently reaffirmed that "the Fourth Amendment to the United States Constitution is 'textually identical' in all relevant respects to Article I, section 10 of the Minnesota Constitution." City of Golden Valley v. Wiebesick , 899 N.W.2d 152, 158 (Minn. 2017) (footnotes omitted). Accordingly, we "take a 'restrained' approach when determining whether the Minnesota Constitution provides different [search and seizure] guarantees than the United States Constitution." Id. (quoting Kahn v. Griffin , 701 N.W.2d 815, 828 (Minn. 2005) ). We will *303 make such a determination (1) when we conclude the "Supreme Court has made a sharp or radical departure from its previous decisions" and we can "discern no persuasive reason to follow such a departure," or (2) if we "determine that the Supreme Court had retrenched on Bill of Rights issues." Kahn , 701 N.W.2d at 828.
Neither exception applies here. Winston was decided 34 years ago. The Supreme Court constructed Winston 's three-prong test based on its decision in Schmerber , where the Court 53 years ago concluded that a forced blood draw of a suspected drunk driver was constitutional. Winston , 470 U.S. at 760-63, 105 S.Ct. 1611 ; Schmerber , 384 U.S. at 771-72, 86 S.Ct. 1826. Neither decision is a sharp or radical departure from Fourth Amendment jurisprudence. Neither can seriously be called a retrenchment-indeed, the three-prong test for searches by warrant involving bodily intrusions arguably enhances Fourth Amendment protections. See Wiebesick , 899 N.W.2d at 163 (refusing to interpret the Minnesota Constitution more broadly than the Fourth Amendment with respect to administrative warrants, in part, because the Supreme Court decision on administrative warrants increased Fourth Amendment protections).
For the foregoing reasons, I respectfully dissent.

The police did not obtain a search warrant in Winston. Instead, the Commonwealth of Virginia filed a motion in state court directing the respondent, a robbery suspect, "to undergo surgery to remove an object thought to be a bullet lodged under his left collarbone." Winston , 470 U.S. at 756, 105 S.Ct. 1611. After several evidentiary hearings, a state court granted the motion to compel surgery, but a federal district court later "enjoined the threatened surgery." Id. at 757, 105 S.Ct. 1611.

The court asserts that my consideration of Brown's lack of cooperation is improper because a person's failure to "cooperate with the police-even in response to a warrant-does not mean the State has a right to cross the line and conduct a search that is unreasonable." But I am not arguing that Brown's refusal to cooperate authorized the police to conduct an unreasonable search. I contend, consistent with Winston , that Brown's refusal to cooperate is relevant to determining if the search conducted in this case was reasonable.

The court suggests that the Supreme Court did not really mean what it said in Vernonia because it "considered a purportedly 'less intrusive' alternative method of testing" as part of its Fourth Amendment analysis. The Court did consider, and then reject as "worse," a different means of drug testing suggested by the respondent in Vernonia . See 515 U.S. at 663, 115 S.Ct. 2386. The Court, however, viewed this as an alternative ground for rejecting the respondent's argument. See id. The fact that the Court gave two reasons for rejecting respondent's argument-first, that it was legally unsound, and second, that it was factually unsound-does not mean the Court's statement about Fourth Amendment law has no impact.

There is nothing in the record indicating that Minneapolis police had access to a facility with non-flushing toilets where they could have securely detained and observed Brown. Presumably, a bucket or other receptacle could provide the alternative bathroom arrangements.